UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Eli Adams, an individual, and Reyna Balboa, an individual, | Court File No. _____ |
| Plaintiffs, | **COMPLAINT FOR DECLARATORY RELIEF AND BREACH OF CONTRACT** |
| v. | |
| Peter Innes, an individual, | |
| Defendant. | |

Plaintiffs Eli Adams and Reyna Balboa, by and through their undersigned attorneys, allege as follows:

## INTRODUCTION

1.      This suit is about defendant Peter Innes' attempt to unwind a transaction that he proposed, designed, and re-affirmed.  As the former owner of the Roblox game "Forsaken," Innes was desperate to pass off ownership after he faced a litany of accusations for personal misconduct.  These accusations were grave enough to imperil the future of the Roblox game.

2.      So, Innes proposed a deal to plaintiffs Eli Adams and Reyna Balboa in which they would assume ownership and management responsibilities for the game.  To hide the deal from his parents, Innes structured it so that he would walk away with $350,000 from the game's operating capital and a 40% revenue share, and retain control of one of the game's financial accounts, allowing him to pretend that he still owned the game.  Adams and Balboa assented to this structure, and Innes immediately transferred the funds to his

account.  Within just a few months, they led Forsaken to its lifetime peak concurrent user count and record-breaking revenue, paying Innes every cent of his revenue share in the process.

3.    Despite the game's success—which Innes continues to profit from—he grew unhappy with his decision to sell the game.  Innes has recently claimed that the sale was void and unenforceable, and has wrongly accused plaintiffs of breaching the agreement. To throw sand in the gears of the deal, Innes has also asked Roblox to freeze the account containing the purchase payment.  And, after the sale was complete, Innes disparaged plaintiffs to third parties and publicly disclosed confidential terms of the Transfer Agreement.

4.    To end Innes' open attempts to undermine the Transfer Agreement, plaintiffs seek a declaration that the Agreement is valid and enforceable, and that plaintiffs are not in breach.  They also seek to recover for Innes' past and continuing breaches of the non-disparagement, confidentiality, and further assurance provisions of the Agreement.

## PARTIES

5.    Eli Adams is an individual domiciled in Lafayette, Louisiana.

6.    Reyna Balboa is an individual domiciled in Vancouver, Canada.

7.    Peter Innes is an individual domiciled in Hackensack, New Jersey.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a).  The parties are completely diverse, and the matter-in-controversy exceeds $75,000, exclusive of interest and costs.

2

200062437v3

9.      This Court has personal jurisdiction over Innes, as he consented to litigate in this forum in Section 10(b) of the Transfer Agreement, which states "the parties hereto submit and consent to the jurisdiction of the courts present in Minnesota in any action brought to enforce (or otherwise relating to) this Agreement."

10.     Venue is proper in this District under 28 U.S.C. § 1391(b) and pursuant to the forum-selection clause of the Transfer Agreement.

## FACTUAL BACKGROUND

11.     Defendant Innes (known by the username "Soul") is the creator of the game "Forsaken." Forsaken is a multiplayer game hosted on the Roblox platform, available at https://www.roblox.com/games/18687417158/Forsaken, with Roblox experience ID 18687417158. At times, it has achieved peaks of more than one million concurrent users, making it one of the most popular games on the platform.

12.     Sometime in the first half of 2025, word began to spread in the Forsaken community that Innes had perpetrated serious misconduct. This led to a massive backlash by the Forsaken fanbase, with many players calling for his removal from the game. Plaintiff Eli Adams (username "Hytoko") provided constant and emphatic emotional support. Adams said he would be there for Innes if he "need[s] somebody to talk to or cry to," and encouraged Innes to take a break from Twitter for his emotional health.

13.     By May 26, 2025, Innes decided that he could no longer handle Forsaken. He asked Adams if he would be willing to temporarily assume "ownership of the discord servers and stuff." Discord is a popular messaging platform for video gamers, and Forsaken is one of many games that has a dedicated "server," where users can discuss the

3

game (much like an online forum).  Innes told Adams that he believed "it'd be best if we publicly shifted ownership around for a bit" due to public perception.  Adams agreed to assume control, and asked if plaintiff Reyna Balboa (username "Basil") could assist with ownership.  Innes readily consented.

14.     Later that evening, Adams and Balboa joined a group chat with Innes and a third-party with the Discord username "Kaiser."  In this chat, Balboa and Kaiser raised a host of concerns with a non-permanent transition, urging Innes to reconsider his insistence that it be temporary.  Specifically, Balboa told Innes that she did not believe the transition would be temporary, and that a temporary transition would be "incredibly wrong" to do to the player base.  She flagged that they had been "flooded" with questions from important people.  Kaiser agreed, noting that "the temporary part brings too many questions and issues."

15.     Innes recognized the concerns, but explained that he was scared of being "thrown away."  He asked for some time to think, which Adams and Balboa had no objection to.

16.     The next morning, Adams learned that Innes was in talks to sell the game to a third-party, Ethan Forbes (who goes by "Pariet" online).  Adams was distraught, worried that this sale would ruin the game.  That day, Innes executed an agreement to transfer ownership to Forbes.  In this agreement, Forbes was named a "[t]emporary owner," who would only assume control for twelve months before ownership of Forsaken would revert to Innes.

4

17.    This ownership lasted for far less than the full twelve month period.  By June 18, 2025, Innes voiced his regret in transferring the game to Forbes because the Forsaken community had reacted very negatively.  Adams offered to put Innes in touch with a lawyer to potentially assist with terminating the agreement, or at the very least so that Innes would "be protected with whatever [he] decide[s] to do in the future."  Innes and Forbes then terminated their agreement.

18.    Soon thereafter, Innes began discussions to permanently transfer the game to Adams and Balboa.  On June 21, 2025, he stated that he was "excited for this entire contract thing to finally go thru."

19.    Innes stated that, "as soon as this contract's done im gonna dip indefinitely."  Adams provided Innes with a draft of the Transfer Agreement over Discord, and then told him to "look over it and such and make sure it all looks good to ya."

20.    Innes (using the Discord username "sunny") noted that the agreement was missing a clause that they had discussed, in which Adams' and Reyna's decision to terminate the Transfer Agreement would cause Forsaken to revert back to Innes.  Recognizing that the transfer was not temporary, Innes stated: "i know it wont happen but i just want the extra protection."  Adams said he would have his attorney add the provision.

5



21.    The parties signed the Transfer Agreement on or around June 29, 2025, a true and correct copy of which is attached hereto as **Exhibit A**.  The agreement was multi-faceted.  At Innes' request, he would REDACTED

REDACTED

REDACTED.  (Agreement § 1(a).)  Adams and Balboa further agreed REDACTED

REDACTED.  (*Id.* § 2(c).)  On top of this, Innes would REDACTED

REDACTED

REDACTED        . (*Id.* § 2(b).) Innes (under the username "sunny") expressly requested that the transaction be structured this way so that his parents would not know that he sold the game, even though at all times relevant to this matter Innes was 18 years-old or older.

22.    For their part, Adams and Balboa assumed "all managerial and operational responsibilities" in Forsaken, which included "the distribution of Forsaken Revenue between any third parties." (Agreement § 2(a).) This was no small task. There are many developers who were owed a revenue share in Forsaken. This part of the deal was critical to Innes, who did not want to deal with Forbes any longer. Adams assured him that he and Balboa would be taking over the contract with Forbes and that Innes would not have to do anything further. As Adams put it: "Leave it to me to deal with."

23.    On July 1, 2025—a few days after the Transfer Agreement was signed— Adams asked Innes whether he took the "REDACTED that was originally promised at the start of the contract." Innes responded "YA i did," noting that he had moved it to the Spectre Account (*i.e.*, the account he would continue to own). Adams then asked for Innes' approval to pull some funds from the Spectre Account to pay for developer flights to a conference. Adams was clear that he wanted to make sure that they did it in such a way that Innes' parents would not find out, given Innes' desire to conceal the transfer. Innes approved the use of funds and stated that he could lie to his parents about it.

24.    In the weeks after the transfer, Innes was ecstatic to see Forsaken reach its peak of one million users and have "such a huge playerbase," celebrating the transfer to Adams and Balboa on multiple different occasions.

7

8





8

25.     Despite the success of the game, Innes began hinting that his parents had discovered the sale, and were pressuring him to unwind it—despite Innes' protests otherwise.



26.     On August 19, 2025, Adams, Balboa, and Innes executed an Amendment to the Transfer Agreement (the "Chance Amendment").   The Chance Amendment acknowledged that Adams and Balboa are the assignees of a 2024 agreement between Innes's agent and Makeship Ltd. for the production and sale of a plush based on the Forsaken character "Chance" (the "Makeship Master Campaign Agreement").  The Chance Amendment granted Innes REDACTED █████████████.   It further recited that, "[e]xcept as set forth in this Amendment, the Agreement is unaffected and shall continue in full force and effect in accordance with its terms."  Innes signed the Chance Amendment via DocuSign on August 21, 2025.

27.     By this time, Roblox had locked the Spectre Account so that neither Innes nor Adams or Balboa could receive revenues from the account.  Even so, Adams and

200062437v3

Balboa automatically **REDACTED** in the game, as it was generated, to the account designated by Innes. Since then, Innes has periodically asked Balboa and Adams to redirect portions of the REDACTED to other third parties, and they have complied in Innes' request. At some point, Innes informed Adams and Balboa that this account was also locked by Roblox, preventing Innes from cashing out currency into USD with that account. Based on plaintiffs' communications with Roblox, this freeze is unrelated to the Forsaken transaction.

28.    In September 2025, to ensure that Innes received a portion of the frozen funds for the transfer (so that he would have access to funds while waiting), Adams wired $45,500 to Innes' account (which Innes acknowledged under the Discord username "delta"). In connection with that wire, Innes provided plaintiffs with a completed Form W-9.



29.    To deal with the frozen Spectre Account, Roblox proposed that it could simply transfer all on-platform currency from pre-Forsaken sale to Innes, then unlock the

10

200062437v3

account for use by Balboa thereafter.  Adams and Balboa, through counsel, provided Innes with another proposed amendment to the Transfer Agreement.  This amendment would immediately provide Innes with the entirety of the Spectre Account funds in Roblox's on-platform currency as measured on the date of the Forsaken sale (pre-transfer) (estimated value $1,561,994.06 in USD), which would be credited against his revenue share until that share exceeded the amount in the Spectre Account.  At this point, Innes was represented by counsel, who never responded to this proposal.

30.    In the background, Innes had begun disparaging Adams and Balboa, and sharing the terms of their confidential Transfer Agreement.  For example, he admitted to Adams that he told a third-party he "despise[s]" Adams and Balboa.  Innes also admitted to sharing the confidential terms of the Transfer Agreement with his then-girlfriend, Ava:



delta  9/23/25, 8:33 PM
then the former three are still a mystery bc i only confided super legally vague details about the agreement to ava

31.    On information and belief, under the Twitter handle @forsakenburner, Innes also shared the confidential revenue share information from the Transfer Agreement, exposing the terms to the world:

200062437v3



32.    In a now-deleted comment, this account also asserted that Adams and Balboa had "lied . . . for months to [their] audience" about Soul's involvement.

33.    In December 2025, Roblox informed plaintiffs that Innes would be given access to the Spectre Account, as he had demanded.  Plaintiffs' counsel informed Innes' counsel of this message, but received no response.  Roblox later informed Innes of this fact, but rather than accept payment, Innes—through his counsel—demanded that Roblox freeze all transactions and transfers from the Spectre Account pending the threatened litigation.

34.    In March 2026, Innes formally asserted that the Transfer Agreement is void and unenforceable, or alternatively, that plaintiffs have materially breached the Agreement.

12

<u>**CLAIMS FOR RELIEF**</u>

**COUNT I**

**Declaratory Judgment**

35. Plaintiffs re-allege and incorporate by reference the allegations of each preceding paragraph as though fully set forth herein.

36. The Transfer Agreement is a valid and enforceable contract supported by adequate consideration. That consideration includes, without limitation: (a) the REDACTED ████████████████████ under Section 2(b); (b) the continuing REDACTED ███████████ under Section 2(c); (c) plaintiffs' assumption of all managerial and operational responsibilities for Forsaken, including the distribution of Forsaken Revenue to third-party developers and the Makeship Master Campaign Agreement, under Section 2(a); and (d) the additional REDACTED ████████████ added by the August 19, 2025 Amendment.

37. The Transfer Agreement was not procured by fraud or duress. Defendant himself initiated the transfer of ownership on May 26, 2025. Defendant had meaningful alternatives, was supported by friends and community members (including "Marceline" and "Kaiser") who urged deliberate decision-making, was offered access to counsel by plaintiffs, negotiated material terms of the Transfer Agreement, and had more than thirty days between the May 26, 2025 initial conversation and the June 29, 2025 signing to consider the transaction.

38. Defendant further ratified and affirmed the Transfer Agreement by, among other things: (a) executing the Chance Amendment on August 21, 2025, more than fifty

13

days after the Transfer Agreement; (b) REDACTED under Section 2(b) by moving it to the Spectre Account on or about the night of signing; (c) accepting the $45,500 wired from Adams in August 2025 and furnishing a Form W-9 in connection with that payment; and (d) accepting REDACTED .

39.     Plaintiffs have substantially performed all obligations required of them under the Transfer Agreement and the August 19, 2025 Amendment.  Plaintiffs have: (a) allowed Innes to REDACTED to the Spectre Account, which Innes himself caused to be transferred, before being frozen by Roblox; (b) paid Innes a portion of the funds that was transferred to the Spectre Account after Roblox froze the account; (c) REDACTED , consistent with the Transfer Agreement and with Roblox's operational requirements; (d) assumed and discharged managerial and operational responsibilities for Forsaken, including distributions to third-party developers; (e) assumed the Makeship Master Campaign Agreement and performed thereunder, including the REDACTED under the Amendment; and (f) continued to perform all other obligations under the Transfer Agreement and the Chance Amendment.

40.     An actual and justiciable controversy exists between plaintiffs and defendants concerning the parties' respective rights in and to Forsaken, as evidenced by defendant's March 17, 2026 demand letter asserting that the Transfer Agreement is "void and unenforceable" and his April 9, 2026 effort to have Roblox Corporation freeze a transferred Asset pending the dispute.  Under 28 U.S.C. § 2201 *et seq.*, plaintiffs are entitled to a judicial declaration that: (a) the Transfer Agreement and the Chance

14

200062437v3

Amendment are valid and enforceable contracts; and (b) plaintiffs have performed, and are not in material breach of, the Transfer Agreement or Chance Amendment.

## COUNT II

### Breach of Contract - Section 9(a))

41.    Plaintiffs re-allege and incorporate by reference the allegations of each preceding paragraph as though fully set forth herein.

42.    The Transfer Agreement is a valid and enforceable contract between plaintiffs and defendant.

43.    Section 9(a) of the Transfer Agreement provides that "the Parties agree that this Agreement will be treated as confidential, and that they will not disclose the terms of this Agreement or any business or strategic information of the other Party and its affiliates, to any third-party without the prior written consent of the non-disclosing Party in each instance," subject to narrow enumerated exceptions.  This provision remains in effect "in perpetuity."

44.    Plaintiffs have performed all conditions precedent to the enforcement of Section 9(a).

45.    Defendant has materially breached Sections 9(a) of the Transfer Agreement by: (a) disclosing the confidential terms of the Transfer Agreement to his then-girlfriend; and (b) on information and belief, causing or directing the September 25, 2025 post from the X (formerly Twitter) account @forsakenburner, which disclosed details about the Transfer Agreement in a public post.  Neither of these disclosures fell within any of the enumerated exceptions in Section 9(a).

200062437v3

46.     Section 9(c) of the Transfer Agreement provides that "any breach of this Section, including any breach of any representation and warranties, would result" in irreparable harm to the non-breaching Party, and the Parties expressly agreed that $50,000 per breach is "a reasonable and fair amount of liquidated damages."  Section 9(c) further entitles the non-breaching Party to seek injunctive relief in addition to liquidated damages.

47.     Plaintiffs have suffered damages as a result of defendant's breach of Section 9(a) in the form of liquidated damages as agreed by the parties in Section 9(c) in an amount not less than $100,000 (representing at least two breaches at $50,000 each), plus any additional $50,000-per-breach amounts established through discovery, plus injunctive relief enjoining further disclosures.

**COUNT III**

**Breach of Contract - Section 9(b)**

48.     Plaintiffs re-allege and incorporate by reference the allegations of each preceding paragraph as though fully set forth herein.

49.     The Transfer Agreement is a valid and enforceable contract between plaintiffs and defendant.

50.     Section 9(b) of the Transfer Agreement provides that defendant "will not, at any time in the future, make any defamatory, negative, unprofessional, or disparaging statements regarding the [plaintiffs], or their affiliates, unless such statements are made truthfully in response to a subpoena or other legal process."  This provision remains in effect "in perpetuity."

16

200062437v3

51.     Plaintiffs have performed all conditions precedent to the enforcement of Section 9(b).

52.     Defendant has materially breached Section 9(b) by: (a) stating to a third-party community member that Innes "despise[s]" Adams and Balboa, which Innes himself admitted to Adams by Discord direct message; and (b) on information and belief, causing or directing the September 25, 2025 post from the X (formerly Twitter) account @forsakenburner, which asserted that plaintiffs "lied . . . for months to [their] audience" about defendant's involvement with the game.

53.     Section 9(c) of the Transfer Agreement provides that "any breach of this Section, including any breach of any representation and warranties, would result" in irreparable harm to the non-breaching Party, and the Parties expressly agreed that $50,000 per breach is "a reasonable and fair amount of liquidated damages."  Section 9(c) further entitles the non-breaching Party to seek injunctive relief in addition to liquidated damages.

54.     Plaintiffs have suffered damages as a result of defendant's breach of Section 9(a) in the form of liquidated damages as agreed by the parties in Section 9(c) in an amount not less than $100,000 (representing at least two breaches at $50,000 each), plus any additional $50,000-per-breach amounts established through discovery, plus injunctive relief enjoining further disclosures.

## COUNT IV

### Breach of Contract - Section 8(b)

55.     Plaintiffs re-allege and incorporate by reference the allegations of each preceding paragraph as though fully set forth herein.

200062437v3

56.     Section 8(b) of the Transfer Agreement provides that, "[w]ithout further consideration, [defendant] will do, execute, acknowledge and deliver all and every such reasonable further acts, assignments, notices, transfers and assurances as may be reasonably requested or required by [plaintiffs] to evidence or implement [plaintiffs'] rights under this Agreement, including, without limitation, assisting with the transfer of the Assets, correspondence with Roblox, and executing and delivering such other instruments of assignment, transfer and conveyance as requested by [plaintiffs]."

57.     Plaintiffs have performed all conditions precedent to enforcement of Section 8(b).

58.     Defendant has materially breached Section 8(b) by: (a) refusing to provide the two-factor authentication code necessary to manage the Forsaken accounts; (b) communicating with Roblox (directly or through counsel) in a manner that has impeded plaintiffs' attempts to transfer ownership of the Forsaken accounts, including the April 9, 2026 letter to Roblox Legal demanding a unilateral freeze of the Spectre Account; and (c) otherwise failing to execute and deliver such instruments and correspondence as would reasonably be required to evidence and implement plaintiffs' rights under the Transfer Agreement.

59.     Monetary damages will not adequately remedy defendant's breach of Section 8(b) because the subject matter of Section 8(b) concerns unique assets (including a Roblox experience with a substantial and active user base) and an ongoing relationship with Roblox Corporation that cannot be readily replaced.  Plaintiffs are therefore entitled to specific performance of Section 8(b), including a court order directing defendant to (i) cooperate in

18

effectuating the transfer of the Spectre Account back to defendant on the terms of the October 10, 2025 proposal or on such other terms as the Court may order; (ii) retract his April 9, 2026 freeze request to Roblox Corporation; and (iii) execute and deliver any further instruments reasonably required to evidence and implement plaintiffs' rights under the Transfer Agreement.

## PRAYER

WHEREFORE, plaintiffs respectfully request that the Court enter judgment in their favor and against defendant as follows:

A.      On the First Claim, a declaration that: (a) the June 29, 2025 Forsaken Transfer Agreement, as amended by the Chance Amendment, is a valid and enforceable contract; and (b) plaintiffs have performed, and are not in material breach of, the Transfer Agreement or the Chance Amendment.

B.      On the Second Claim, awarding plaintiffs liquidated damages under Section 9(c) of the Transfer Agreement in an amount not less than $100,000, plus $50,000 for each additional breach of Section 9(b) established through discovery;

C.      On the Third Claim, awarding plaintiffs liquidated damages under Section 9(c) of the Transfer Agreement in an amount not less than $100,000, plus $50,000 for each additional breach of Section 9(a) established through discovery, together with a permanent injunction enjoining defendant from any further disclosure of the confidential terms of the Transfer Agreement or any business or strategic information of plaintiffs;

D.      On the Fourth Claim, ordering specific performance of Section 8(b) of the Transfer Agreement, including an order directing defendant to: (i) cooperate in effectuating

19

the transfer of the Spectre Account back to defendant on the terms of plaintiffs' October 10, 2025 proposed amendment or such other terms as the Court deems appropriate; (ii) retract his April 9, 2026 letter to Roblox Corporation seeking a freeze of the @forsakendevelopment account; and (iii) execute and deliver any further instruments reasonably requested by plaintiffs to evidence and implement plaintiffs' rights under the Transfer Agreement;

E.      Awarding plaintiffs their reasonable attorneys' fees, costs, and disbursements incurred in this action pursuant to Section 10(f) of the Transfer Agreement and any other applicable authority;

F.      Awarding plaintiffs pre-judgment and post-judgment interest at the maximum rate allowed by law; and

G.      Granting such other and further relief as the Court deems just and proper.

200062437v3

Dated: April 29, 2026

**TAFT STETTINIUS & HOLLISTER LLP**

By: */s/ Andrew S. Dosdall*

    Andrew S. Dosdall, Bar No. 0391076
    ADosdall@Taftlaw.com
2200 IDS Center 80 South 8th Street
Minneapolis, MN  55402-2210
Telephone:  (612) 977-8400
Facsimile:    (612) 977-8650

and

Joseph M. Levy, OSB #231905 (*Pro Hac Vice* Forthcoming)
JosephLevy@MarkowitzHerbold.com
**MARKOWITZ HERBOLD PC**
1455 SW Broadway, Suite 1900
Portland, OR  97201
Telephone: (503) 295-3085

*Attorneys for Plaintiffs*
*Eli Adams and Reyna Balboa*

21

200062437v3