**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

| | |
|---|---|
| Eli Adams, an individual, and Reyna Balboa, an individual, | Court File No. 0:26-cv-02415 (JMB/SGE) |
| Plaintiffs and Counterclaim Defendants, | |
| v. | **DEFENDANT AND COUNTERCLAIM PLAINTIFF PETER INNES' ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM** |
| Peter Innes, an individual, | |
| Defendant and Counterclaim Plaintiff. | **JURY TRIAL DEMANDED** |

---

Defendant and Counterclaim Plaintiff Peter Innes ("Peter"), by and through counsel, answers the Complaint filed by Plaintiffs and Counterclaim Defendants Eli Adams ("Adams") and Reyna Balboa ("Balboa") (collectively, the "Counterclaim Defendants") as follows and asserts the following counterclaims. Except as expressly admitted, Defendant denies each and every allegation in the Complaint.

## ANSWER

### INTRODUCTION

1. This suit is about defendant Peter Innes' attempt to unwind a transaction that he proposed, designed, and re-affirmed. As the former owner of the Roblox game "Forsaken," Innes was desperate to pass off ownership after he faced a litany of accusations for personal misconduct. These accusations were grave enough to imperil the future of the Roblox game.

**Answer:** Defendant admits that he is the owner of *Forsaken* and that public accusations have been made about him. Defendant denies that he "proposed, designed, and re-affirmed" the transaction as characterized, denies that he was "desperate to pass off

1

ownership," and denies that the accusations constituted "personal misconduct" as characterized. To the extent not admitted, denied.

2. So, Innes proposed a deal to plaintiffs Eli Adams and Reyna Balboa in which they would assume ownership and management responsibilities for the game. To hide the deal from his parents, Innes structured it so that he would walk away with $350,000 from the game's operating capital and a 40% revenue share, and retain control of one of the game's financial accounts, allowing him to pretend that he still owned the game. Adams and Balboa assented to this structure, and Innes immediately transferred the funds to his account. Within just a few months, they led *Forsaken* to its lifetime peak concurrent user count and record-breaking revenue, paying Innes every cent of his revenue share in the process.

**Answer:** Defendant admits in part and denies in part. Defendant admits the Transfer Agreement described a payment of $350,000 but denies that such funds were property owned or controlled by Plaintiffs and that Plaintiffs paid this amount to Defendant. Defendant admits that the Transfer Agreement described a 40% revenue share but denies that his entitlement to such funds derives from or depends upon the Transfer Agreement. Defendant denies that he proposed the transaction and denies the remaining allegations as characterized. To the extent not admitted, denied.

3. Despite the game's success—which Innes continues to profit from—he grew unhappy with his decision to sell the game. Innes has recently claimed that the sale was void and unenforceable, and has wrongly accused plaintiffs of breaching the agreement. To throw sand in the gears of the deal, Innes has also asked Roblox to freeze the account containing the purchase payment. And, after the sale was complete, Innes disparaged plaintiffs to third parties and publicly disclosed confidential terms of the Transfer Agreement.

**Answer:** Defendant admits that he has asserted that the Transfer Agreement is void and unenforceable or, in the alternative, that Plaintiffs have materially breached the Transfer Agreement. Defendant admits that he directed his counsel to contact Roblox

regarding the status of certain Roblox accounts described in the complaint. Defendant denies the remaining allegations as characterized. To the extent not admitted, denied.

4.      To end Innes' open attempts to undermine the Transfer Agreement, plaintiffs seek a declaration that the Agreement is valid and enforceable, and that plaintiffs are not in breach. They also seek to recover for Innes' past and continuing breaches of the non-disparagement, confidentiality, and further assurance provisions of the Agreement.

**Answer:** Paragraph 4 states Plaintiffs' claims for relief to which no response is required. To the extent a response is required, denied.

## PARTIES

5.      Eli Adams is an individual domiciled in Lafayette, Louisiana.

**Answer:** Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 5 and therefore denies them.

6.      Reyna Balboa is an individual domiciled in Vancouver, Canada.

**Answer:** Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 6 and therefore denies them.

7.      Peter Innes is an individual domiciled in Hackensack, New Jersey

**Answer:** Defendant admits that he is an individual domiciled in Hackensack, New Jersey.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a). The parties are completely diverse, and the matter-in-controversy exceeds $75,000, exclusive of interest and costs.

**Answer:** Defendant admits that this Court has subject matter jurisdiction over this action. The remaining allegations in Paragraph 8 state legal conclusions to which no response is required.

9.     This Court has personal jurisdiction over Innes, as he consented to litigate in this forum in Section 10(b) of the Transfer Agreement, which states "the parties hereto submit and consent to the jurisdiction of the courts present in Minnesota in any action brought to enforce (or otherwise relating to) this Agreement."

**Answer:** Defendant admits that this Court has personal jurisdiction over Defendant. The remaining allegations in Paragraph 9 state legal conclusions to which no response is required.

10.     Venue is proper in this District under 28 U.S.C. § 1391(b) and pursuant to the forum-selection clause of the Transfer Agreement.

**Answer:** Defendant admits that this Court has subject matter jurisdiction, that this Court has personal jurisdiction over Defendant, and that venue is proper in this District. The remaining allegations in Paragraph 10 state legal conclusions to which no response is required.

## FACTUAL BACKGROUND

11.     Defendant Innes (known by the username "Soul") is the creator of the game "Forsaken." *Forsaken* is a multiplayer game hosted on the Roblox platform, available at https://www.roblox.com/games/18687417158/*Forsaken*, with Roblox experience ID 18687417158. At times, it has achieved peaks of more than one million concurrent users, making it one of the most popular games on the platform.

**Answer:** Defendant admits that he is known by the username "Soul," that he created *Forsaken*, that *Forsaken* is a multiplayer game hosted on the Roblox platform, that *Forsaken* is one of the top-performing experiences on Roblox with millions of players, and that *Forsaken* is associated with Roblox experience ID 18687417158. Defendant denies the remaining allegations in Paragraph 11 as characterized. To the extent not admitted, denied.

12.     Sometime in the first half of 2025, word began to spread in the Forsaken community that Innes had perpetrated serious misconduct. This led to a massive backlash

4

by the *Forsaken* fanbase, with many players calling for his removal from the game. Plaintiff Eli Adams (username "Hytoko") provided constant and emphatic emotional support. Adams said he would be there for Innes if he "need[s] somebody to talk to or cry to," and encouraged Innes to take a break from Twitter for his emotional health.

**Answer:** Defendant admits that public accusations concerning him circulated within the Forsaken community in the first half of 2025 and that members of the community called for his removal. Defendant admits that Adams made statements purporting to provide emotional support. Defendant denies Plaintiffs' characterization of the accusations and denies the remaining allegations as characterized. To the extent not admitted, denied.

13.     By May 26, 2025, Innes decided that he could no longer handle *Forsaken*. He asked Adams if he would be willing to temporarily assume "ownership of the discord servers and stuff." Discord is a popular messaging platform for video gamers, and *Forsaken* is one of many games that has a dedicated "server," where users can discuss the game (much like an online forum). Innes told Adams that he believed "it'd be best if we publicly shifted ownership around for a bit" due to public perception. Adams agreed to assume control, and asked if plaintiff Reyna Balboa (username "Basil") could assist with ownership. Innes readily consented.

**Answer:** Defendant admits that Discord is a messaging platform used by video game communities and that *Forsaken* had a dedicated Discord server (the "Forsaken Discord Servers"). Defendant admits that on May 26, 2025, he communicated with Adams and Balboa on Discord concerning control over the Forsaken Discord Servers. Defendant denies that his communications authorized Plaintiffs to permanently seize or retain ownership or control of the Forsaken Discord Servers or *Forsaken*. Defendant denies Plaintiffs' characterization of the discussions on Discord on May 26, 2025. To the extent not admitted, denied.

14. Later that evening, Adams and Balboa joined a group chat with Innes and a third-party with the Discord username "Kaiser." In this chat, Balboa and Kaiser raised a host of concerns with a non-permanent transition, urging Innes to reconsider his insistence that it be temporary. Specifically, Balboa told Innes that she did not believe the transition would be temporary, and that a temporary transition would be "incredibly wrong" to do to the player base. She flagged that they had been "flooded" with questions from important people. Kaiser agreed, noting that "the temporary part brings too many questions and issues."

**Answer:** Defendant admits that he participated in communications with the Plaintiffs and others in a Discord group chat on May 26, 2025, involving Defendant, Adams, Balboa, and others. Defendant denies Plaintiffs' characterization of those communications. To the extent not admitted, denied.

15. Innes recognized the concerns, but explained that he was scared of being "thrown away." He asked for some time to think, which Adams and Balboa had no objection to.

**Answer:** Defendant admits that the quoted language appears in Discord transcripts but denies Plaintiffs' characterization of those communications and the surrounding circumstances. Defendant denies the remaining allegations in paragraph 15. To the extent not admitted, denied.

16. The next morning, Adams learned that Innes was in talks to sell the game to a third-party, Ethan Forbes (who goes by "Pariet" online). Adams was distraught, worried that this sale would ruin the game. That day, Innes executed an agreement to transfer ownership to Forbes. In this agreement, Forbes was named a "[t]emporary owner," who would only assume control for twelve months before ownership of *Forsaken* would revert to Innes.

**Answer:** Defendant admits that he entered into an agreement with a third party known as Ethan Forbes on or about May 27, 2025. Defendant lacks knowledge or information sufficient to form a belief as to Plaintiffs' characterization of Adams's

emotional state or motivations and therefore denies those allegations. Defendant denies the remaining allegations as characterized. To the extent not admitted, denied.

17.    This ownership lasted for far less than the full twelve month period. By June 18, 2025, Innes voiced his regret in transferring the game to Forbes because the Forsaken community had reacted very negatively. Adams offered to put Innes in touch with a lawyer to potentially assist with terminating the agreement, or at the very least so that Innes would "be protected with whatever [he] decide[s] to do in the future." Innes and Forbes then terminated their agreement.

**Answer:** Defendant admits that the Forbes arrangement ended before twelve months. Defendant admits that Adams made statements about legal assistance. Defendant denies Plaintiffs' characterization of those statements and denies the remaining allegations as characterized. To the extent not admitted, denied.

18.    Soon thereafter, Innes began discussions to permanently transfer the game to Adams and Balboa. On June 21, 2025, he stated that he was "excited for this entire contract thing to finally go thru."

**Answer:** Defendant admits that the quoted language appears in Discord transcripts. Defendant denies that he voluntarily initiated or freely engaged in discussions to permanently transfer *Forsaken* and denies the remaining allegations as characterized. To the extent not admitted, denied.

19.    Innes stated that, "as soon as this contract's done im gonna dip indefinitely." Adams provided Innes with a draft of the Transfer Agreement over Discord, and then told him to "look over it and such and make sure it all looks good to ya."

**Answer:** Defendant admits that the quoted language appears in Discord transcripts and that Adams provided a draft Transfer Agreement over Discord. Defendant denies the remaining allegations as characterized. To the extent not admitted, denied.

20.    Innes (using the Discord username "sunny") noted that the agreement was missing a clause that they had discussed, in which Adams' and Reyna's decision to

terminate the Transfer Agreement would cause *Forsaken* to revert back to Innes. Recognizing that the transfer was not temporary, Innes stated: "i know it wont happen but i just want the extra protection." Adams said he would have his attorney add the provision.

**Answer:** Defendant admits that the quoted language appears in Discord transcripts but denies Plaintiffs' characterization of those communications and the surrounding circumstances. Defendant denies the remaining allegations in paragraph 20. To the extent not admitted, denied.

21.     The parties signed the Transfer Agreement on or around June 29, 2025, a true and correct copy of which is attached hereto as Exhibit A. The agreement was multi-faceted. At Innes' request, he would ███████████████████████████████████████████████████████ ███████████████████. (Agreement § 1(a).) Adams and Balboa further agreed ██████████████. (Id. § 2(c).) On top of this, Innes would ████████████ ███████████████████████████████. (Id. § 2(b).) Innes (under the username "sunny") expressly requested that the transaction be structured this way so that his parents would not know that he sold the game, even though at all times relevant to this matter Innes was 18 years-old or older.

**Answer:** Defendant admits that he and Plaintiffs electronically signed a document titled "Forsaken Transfer Agreement" on or about June 29, 2025. Defendant denies Plaintiffs' characterization of the document, its purported consideration, its legal effect, and the circumstances under which it was signed. Defendant denies that the document is a valid or enforceable contract. To the extent not admitted, denied.

22.     For their part, Adams and Balboa assumed "all managerial and operational responsibilities" in *Forsaken*, which included "the distribution of Forsaken Revenue between any third parties." (Agreement § 2(a).) This was no small task. There are many developers who were owed a revenue share in *Forsaken*. This part of the deal was critical to Innes, who did not want to deal with Forbes any longer. Adams assured him that he and Balboa would be taking over the contract with Forbes and that Innes would not have to do anything further. As Adams put it: "Leave it to me to deal with."

8

**Answer:** Defendant admits that a third party held a revenue interests in *Forsaken*. Defendant admits that Adams made the quoted statement and denies Plaintiffs' characterization of that statement and the surrounding circumstances. Defendant denies the remaining allegations in paragraph 22. To the extent not admitted, denied.

23.    On July 1, 2025—a few days after the Transfer Agreement was signed— Adams asked Innes whether he took the "▮▮▮ USD that was originally promised at the start of the contract." Innes responded "YA i did," noting that he had moved it to the Spectre Account (i.e., the account he would continue to own). Adams then asked for Innes' approval to pull some funds from the Spectre Account to pay for developer flights to a conference. Adams was clear that he wanted to make sure that they did it in such a way that Innes' parents would not find out, given Innes' desire to conceal the transfer. Innes approved the use of funds and stated that he could lie to his parents about it.

**Answer:** Defendant admits that the quoted language appears in Discord transcripts but denies Plaintiffs' characterization of those communications and events. Defendant denies the remaining allegations in paragraph 23. To the extent not admitted, denied.

24.    In the weeks after the transfer, Innes was ecstatic to see *Forsaken* reach its peak of one million users and have "such a huge playerbase," celebrating the transfer to Adams and Balboa on multiple different occasions.

**Answer:** Defendant admits that the quoted language in the image included in paragraph 24 appears in Discord transcripts but denies Plaintiffs' characterization of those communications and events. Defendant denies the remaining allegations in paragraph 24. To the extent not admitted, denied.

25.    Despite the success of the game, Innes began hinting that his parents had discovered the sale, and were pressuring him to unwind it—despite Innes' protests otherwise.

**Answer:** Defendant admits that the Discord transcripts contain statements concerning his parents' awareness of the purported transfer. Defendant denies Plaintiffs'

characterization of those statements and the surrounding circumstances. Defendant denies the remaining allegations in paragraph 25. To the extent not admitted, denied.

26.    On August 19, 2025, Adams, Balboa, and Innes executed an Amendment to the Transfer Agreement (the "Chance Amendment"). The Chance Amendment acknowledged that Adams and Balboa are the assignees of a 2024 agreement between Innes's agent and Makeship Ltd. for the production and sale of a plush based on the *Forsaken* character "Chance" (the "Makeship Master Campaign Agreement"). The Chance Amendment granted Innes █████████████████████████████████████ ████████████████████. It further recited that, "[e]xcept as set forth in this Amendment, the Agreement is unaffected and shall continue in full force and effect in accordance with its terms." Innes signed the Chance Amendment via DocuSign on August 21, 2025.

**Answer:** Defendant admits that he signed the Chance Amendment on August 21, 2025. Defendant denies Plaintiffs' characterization of that document and its legal effect. Defendant denies the remaining allegations in paragraph 26. To the extent not admitted, denied.

27.    By this time, Roblox had locked the Spectre Account so that neither Innes nor Adams or Balboa could receive revenues from the account. Even so, Adams and Balboa automatically ████████████████████ in the game, as it was generated, to the account designated by Innes. Since then, Innes has periodically asked Balboa and Adams to redirect portions of the ████ to other third parties, and they have complied in Innes' request. At some point, Innes informed Adams and Balboa that this account was also locked by Roblox, preventing Innes from cashing out currency into USD with that account. Based on plaintiffs' communications with Roblox, this freeze is unrelated to the *Forsaken* transaction.

**Answer:** Defendant admits that Plaintiffs had access to the Spectre Account at certain times but lacks knowledge or information sufficient to form a belief as to actions taken by Roblox. Defendant admits that he directed payments to third parties but denies Plaintiffs' characterization of those payments and related events. Defendant denies the remaining allegations in paragraph 27. To the extent not admitted, denied.

28.    In September 2025, to ensure that Innes received a portion of the frozen funds for the transfer (so that he would have access to funds while waiting), Adams wired $45,500 to Innes' account (which Innes acknowledged under the Discord username "delta"). In connection with that wire, Innes provided plaintiffs with a completed Form W-9.

**Answer:** Defendant admits that a $45,500 payment was made and that Defendant provided a Form W-9. Defendant admits that the quoted language appears in Discord transcripts but denies Plaintiffs' characterization of those transactions and related events. Defendant denies the remaining allegations in paragraph 28. To the extent not admitted, denied.

29.    To deal with the frozen Spectre Account, Roblox proposed that it could simply transfer all on-platform currency from pre-*Forsaken* sale to Innes, then unlock the account for use by Balboa thereafter. Adams and Balboa, through counsel, provided Innes with another proposed amendment to the Transfer Agreement. This amendment would immediately provide Innes with the entirety of the Spectre Account funds in Roblox's on-platform currency as measured on the date of the *Forsaken* sale (pre-transfer) (estimated value $1,561,994.06 in USD), which would be credited against his revenue share until that share exceeded the amount in the Spectre Account. At this point, Innes was represented by counsel, who never responded to this proposal.

**Answer:** Defendant admits Roblox policy affected the Roblox accounts and that Plaintiffs proposed an amendment concerning the Spectre Account. Defendant denies Plaintiffs' characterization of that proposal and the significance of any non-response thereto. Defendant denies the remaining allegations in paragraph 29. To the extent not admitted, denied.

30.    In the background, Innes had begun disparaging Adams and Balboa, and sharing the terms of their confidential Transfer Agreement. For example, he admitted to Adams that he told a third-party he "despise[s]" Adams and Balboa. Innes also admitted to sharing the confidential terms of the Transfer Agreement with his then-girlfriend, Ava:

**Answer:** Defendant admits that the quoted language appears in Discord transcripts but denies Plaintiffs' characterization of those statements and the surrounding circumstances. Defendant denies the remaining allegations in paragraph 30. To the extent not admitted, denied.

31.     On information and belief, under the Twitter handle @forsakenburner, Innes also shared the confidential revenue share information from the Transfer Agreement, exposing the terms to the world:

**Answer:** Defendant denies that he authored, caused, or directed the referenced post. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 31 and therefore denies them.

32.     In a now-deleted comment, this account also asserted that Adams and Balboa had "lied . . . for months to [their] audience" about Soul's involvement.

**Answer:** Defendant denies that he authored, caused, or directed the referenced comment. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 32 and therefore denies them.

33.     In December 2025, Roblox informed plaintiffs that Innes would be given access to the Spectre Account, as he had demanded. Plaintiffs' counsel informed Innes' counsel of this message, but received no response. Roblox later informed Innes of this fact, but rather than accept payment, Innes—through his counsel—demanded that Roblox freeze all transactions and transfers from the Spectre Account pending the threatened litigation.

**Answer:** Defendant lacks knowledge or information sufficient to form a belief as to the truth of Plaintiffs' allegations concerning communications between Roblox and Plaintiffs and therefore denies them. Defendant admits that through counsel he sought to preserve the status quo regarding the Spectre Account pending resolution of the parties' dispute. Defendant denies Plaintiffs' characterization of those events and Defendant's

12

actions. Defendant denies the remaining allegations in paragraph 33. To the extent not admitted, denied.

34. In March 2026, Innes formally asserted that the Transfer Agreement is void and unenforceable, or alternatively, that plaintiffs have materially breached the Agreement.

**Answer:** Defendant admits that in March 2026 he formally asserted that the Transfer Agreement is void and unenforceable or, alternatively, that Plaintiffs materially breached the Transfer Agreement. To the extent not admitted, denied.

## CLAIMS FOR RELIEF

## COUNT I

### Declaratory Judgment

35. Plaintiffs re-allege and incorporate by reference the allegations of each preceding paragraph as though fully set forth herein.

**Answer:** Defendant incorporates his responses to the preceding paragraphs as though fully set forth herein.

36. The Transfer Agreement is a valid and enforceable contract supported by adequate consideration. That consideration includes, without limitation: (a) the ███████ ████████████████████████ under Section 2(b); (b) the continuing ███████ ██████████████ under Section 2(c); (c) plaintiffs' assumption of all managerial and operational responsibilities for *Forsaken*, including the distribution of Forsaken Revenue to third-party developers and the Makeship Master Campaign Agreement, under Section 2(a); and (d) the additional ████████████████████████ added by the August 19, 2025 Amendment.

**Answer:** Defendant denies the allegations in paragraph 36.

37. The Transfer Agreement was not procured by fraud or duress. Defendant himself initiated the transfer of ownership on May 26, 2025. Defendant had meaningful alternatives, was supported by friends and community members (including "Marceline" and "Kaiser") who urged deliberate decision-making, was offered access to counsel by plaintiffs, negotiated material terms of the Transfer Agreement, and had more than thirty days between the May 26, 2025 initial conversation and the June 29, 2025 signing to consider the transaction.

**Answer:** Defendant denies the allegations in paragraph 37.

38.     Defendant further ratified and affirmed the Transfer Agreement by, among other things: (a) executing the Chance Amendment on August 21, 2025, more than fifty days after the Transfer Agreement; (b) ███████████████████████ under Section 2(b) by moving it to the Spectre Account on or about the night of signing; (c) accepting the $45,500 wired from Adams in August 2025 and furnishing a Form W-9 in connection with that payment; and (d) accepting ████████████████████████ .

**Answer:** Defendant denies the allegations in paragraph 38.

39.     Plaintiffs have substantially performed all obligations required of them under the Transfer Agreement and the August 19, 2025 Amendment. Plaintiffs have: (a) allowed Innes to ██████████████████████ to the Spectre Account, which Innes himself caused to be transferred, before being frozen by Roblox; (b) paid Innes a portion of the funds that was transferred to the Spectre Account after Roblox froze the account; (c) ████ ██████████████████████ , consistent with the Transfer Agreement and with Roblox's operational requirements; (d) assumed and discharged managerial and operational responsibilities for *Forsaken*, including distributions to third-party developers; (e) assumed the Makeship Master Campaign Agreement and performed thereunder, including the ████████████████████████ under the Amendment; and (f) continued to perform all other obligations under the Transfer Agreement and the Chance Amendment.

**Answer:** Defendant denies the allegations in paragraph 39.

40.     An actual and justiciable controversy exists between plaintiffs and defendants concerning the parties' respective rights in and to *Forsaken*, as evidenced by defendant's March 17, 2026 demand letter asserting that the Transfer Agreement is "void and unenforceable" and his April 9, 2026 effort to have Roblox Corporation freeze a transferred Asset pending the dispute. Under 28 U.S.C. § 2201 et seq., plaintiffs are entitled to a judicial declaration that: (a) the Transfer Agreement and the Chance Amendment are valid and enforceable contracts; and (b) plaintiffs have performed, and are not in material breach of, the Transfer Agreement or Chance Amendment.

**Answer:** Defendant admits that an actual controversy exists concerning the parties'

respective rights in and to *Forsaken*. Defendant admits that he asserted in his March 17,

2026 demand letter that the Transfer Agreement is void and unenforceable and that through

counsel he sought to preserve the status quo regarding disputed assets. Defendant denies

14

that Plaintiffs are entitled to the requested declaration or any other relief. Defendant denies

the remaining allegations in paragraph 40. To the extent not admitted, denied.

## COUNT II

### Breach of Contract - Section 9(a)

41.    Plaintiffs re-allege and incorporate by reference the allegations of each preceding paragraph as though fully set forth herein.

**Answer:** Defendant incorporates by reference his responses to all preceding

paragraphs as though fully set forth herein.

42.    The Transfer Agreement is a valid and enforceable contract between plaintiffs and defendant.

**Answer:** Defendant denies the allegations in paragraph 42.

43.    Section 9(a) of the Transfer Agreement provides that "the Parties agree that this Agreement will be treated as confidential, and that they will not disclose the terms of this Agreement or any business or strategic information of the other Party and its affiliates, to any third-party without the prior written consent of the non-disclosing Party in each instance," subject to narrow enumerated exceptions. This provision remains in effect "in perpetuity."

**Answer:** Defendant admits that Section 9(a) of the Transfer Agreement contains

the provisions it contains. Defendant denies Plaintiffs' characterization of Section 9(a) and

its application. Defendant denies the remaining allegations in paragraph 43. To the extent

not admitted, denied.

44.    Plaintiffs have performed all conditions precedent to the enforcement of Section 9(a).

**Answer:** Defendant denies the allegations in paragraph 44.

45.    Defendant has materially breached Sections 9(a) of the Transfer Agreement by: (a) disclosing the confidential terms of the Transfer Agreement to his then-girlfriend; and (b) on information and belief, causing or directing the September 25, 2025 post from the X (formerly Twitter) account @forsakenburner, which disclosed details about the

Transfer Agreement in a public post. Neither of these disclosures fell within any of the enumerated exceptions in Section 9(a).

**Answer:** Defendant denies that he materially breached Section 9(a). Defendant admits that the quoted language appears in Discord transcripts but denies that any such statements constitute a disclosure of confidential terms or a breach of any provision. Defendant denies that he caused or directed the referenced post. Defendant denies the remaining allegations in paragraph 45. To the extent not admitted, denied.

46.     Section 9(c) of the Transfer Agreement provides that "any breach of this Section, including any breach of any representation and warranties, would result" in irreparable harm to the non-breaching Party, and the Parties expressly agreed that $50,000 per breach is "a reasonable and fair amount of liquidated damages." Section 9(c) further entitles the non-breaching Party to seek injunctive relief in addition to liquidated damages.

**Answer:** Defendant admits that Section 9(c) of the Transfer Agreement contains the provisions it contains. Defendant denies that Plaintiffs are entitled to liquidated damages, injunctive relief, or any other relief. Defendant denies the remaining allegations in paragraph 46. To the extent not admitted, denied.

47.     Plaintiffs have suffered damages as a result of defendant's breach of Section 9(a) in the form of liquidated damages as agreed by the parties in Section 9(c) in an amount not less than $100,000 (representing at least two breaches at $50,000 each), plus any additional $50,000-per-breach amounts established through discovery, plus injunctive relief enjoining further disclosures.

**Answer:** Defendant denies the allegations in paragraph 47.

## COUNT III

### Breach of Contract - Section 9(b)

48.     Plaintiffs re-allege and incorporate by reference the allegations of each preceding paragraph as though fully set forth herein.

16

**Answer:** Defendant incorporates his responses to the preceding paragraphs as though fully set forth herein.

49.    The Transfer Agreement is a valid and enforceable contract between plaintiffs and defendant.

**Answer:** Defendant denies the allegations in paragraph 49.

50.    Section 9(b) of the Transfer Agreement provides that defendant "will not, at any time in the future, make any defamatory, negative, unprofessional, or disparaging statements regarding the [plaintiffs], or their affiliates, unless such statements are made truthfully in response to a subpoena or other legal process." This provision remains in effect "in perpetuity."

**Answer:** Defendant admits that Section 9(b) of the Transfer Agreement contains the provisions it contains. Defendant denies Plaintiffs' characterization of Section 9(b) and its application. Defendant denies the remaining allegations in paragraph 50. To the extent not admitted, denied.

51.    Plaintiffs have performed all conditions precedent to the enforcement of Section 9(b).

**Answer:** Defendant denies the allegations in paragraph 51.

52.    Defendant has materially breached Section 9(b) by: (a) stating to a third-party community member that Innes "despise[s]" Adams and Balboa, which Innes himself admitted to Adams by Discord direct message; and (b) on information and belief, causing or directing the September 25, 2025 post from the X (formerly Twitter) account @forsakenburner, which asserted that plaintiffs "lied . . . for months to [their] audience" about defendant's involvement with the game.

**Answer:** Defendant denies that he materially breached Section 9(b). Defendant admits that the quoted language appears in Discord transcripts but denies that any such statement constitutes disparagement or a breach of any provision. Defendant denies that he caused or directed the referenced post. Defendant denies the remaining allegations in paragraph 52. To the extent not admitted, denied.

17

53.     Section 9(c) of the Transfer Agreement provides that "any breach of this Section, including any breach of any representation and warranties, would result" in irreparable harm to the non-breaching Party, and the Parties expressly agreed that $50,000 per breach is "a reasonable and fair amount of liquidated damages." Section 9(c) further entitles the non-breaching Party to seek injunctive relief in addition to liquidated damages.

**Answer:** Defendant admits that Section 9(c) of the Transfer Agreement contains the provisions it contains. Defendant denies that Plaintiffs are entitled to liquidated damages, injunctive relief, or any other relief. Defendant denies the remaining allegations in paragraph 53. To the extent not admitted, denied.

54.     Plaintiffs have suffered damages as a result of defendant's breach of Section 9(a) in the form of liquidated damages as agreed by the parties in Section 9(c) in an amount not less than $100,000 (representing at least two breaches at $50,000 each), plus any additional $50,000-per-breach amounts established through discovery, plus injunctive relief enjoining further disclosures.

**Answer:** Defendant denies the allegations in paragraph 54.

## COUNT IV

### Breach of Contract - Section 8(b)

55.     Plaintiffs re-allege and incorporate by reference the allegations of each preceding paragraph as though fully set forth herein.

**Answer:** Defendant incorporates by reference his responses to all preceding paragraphs as though fully set forth herein.

56.     Section 8(b) of the Transfer Agreement provides that, "[w]ithout further consideration, [defendant] will do, execute, acknowledge and deliver all and every such reasonable further acts, assignments, notices, transfers and assurances as may be reasonably requested or required by [plaintiffs] to evidence or implement [plaintiffs'] rights under this Agreement, including, without limitation, assisting with the transfer of the Assets, correspondence with Roblox, and executing and delivering such other instruments of assignment, transfer and conveyance as requested by [plaintiffs]."

**Answer:** Defendant admits that Section 8(b) of the Transfer Agreement contains the provisions it contains. Defendant denies Plaintiffs' characterization of Section 8(b) and

18

its application. Defendant denies the remaining allegations in paragraph 56. To the extent not admitted, denied.

57.    Plaintiffs have performed all conditions precedent to enforcement of Section 8(b).

**Answer:** Defendant denies the allegations in paragraph 57.

58.    Defendant has materially breached Section 8(b) by: (a) refusing to provide the two-factor authentication code necessary to manage the *Forsaken* accounts; (b) communicating with Roblox (directly or through counsel) in a manner that has impeded plaintiffs' attempts to transfer ownership of the *Forsaken* accounts, including the April 9, 2026 letter to Roblox Legal demanding a unilateral freeze of the Spectre Account; and (c) otherwise failing to execute and deliver such instruments and correspondence as would reasonably be required to evidence and implement plaintiffs' rights under the Transfer Agreement.

**Answer:** Defendant denies that he materially breached Section 8(b). Defendant admits that through counsel he communicated with Roblox to preserve the status quo regarding disputed assets. Defendant denies Plaintiffs' characterization of those communications and actions. Defendant denies the remaining allegations in paragraph 58. To the extent not admitted, denied.

59.    Monetary damages will not adequately remedy defendant's breach of Section 8(b) because the subject matter of Section 8(b) concerns unique assets (including a Roblox experience with a substantial and active user base) and an ongoing relationship with Roblox Corporation that cannot be readily replaced. Plaintiffs are therefore entitled to specific performance of Section 8(b), including a court order directing defendant to (i) cooperate in effectuating the transfer of the Spectre Account back to defendant on the terms of the October 10, 2025 proposal or on such other terms as the Court may order; (ii) retract his April 9, 2026 freeze request to Roblox Corporation; and (iii) execute and deliver any further instruments reasonably required to evidence and implement plaintiffs' rights under the Transfer Agreement.

**Answer:** Defendant denies the allegations in paragraph 59.

19

**PLAINTIFFS' PRAYER FOR RELIEF**

Defendant denies that Plaintiffs are entitled to any of the relief requested in the Prayer for Relief, including declaratory relief, liquidated damages, injunctive relief, specific performance, attorneys' fees, costs, disbursements, interest, or any other relief. Defendant requests that the Complaint be dismissed with prejudice, that judgment be entered in Defendant's favor on all claims, and that Defendant be awarded the relief requested in his Counterclaims, together with such other and further relief as the Court deems just and proper.

**AFFIRMATIVE DEFENSES**

Defendant incorporates by reference the factual allegations set forth in his Counterclaims as though fully set forth herein. Each affirmative defense is supported by and incorporates those allegations.

1.     The Complaint fails to state claims upon which relief may be granted, in whole or in part.

2.     The Transfer Agreement, the Chance Amendment, any purported transfer of the Forsaken Discord Servers or associated assets, and any other provisions or arrangements on which Plaintiffs rely are void, voidable, invalid, unenforceable, or subject to rescission, in whole or in part.

3.     Plaintiffs' claims are barred, in whole or in part, because the Transfer Agreement was procured through fraud, fraudulent inducement, misrepresentation, omission, and concealment. The circumstances constituting fraud and fraudulent

20

inducement are set forth with particularity in Defendant's Counterclaims, which are incorporated herein by reference.

4.     Plaintiffs' claims are barred, in whole or in part, because the Transfer Agreement was procured through duress, coercion, undue pressure, undue influence, and exploitation of Defendant's vulnerability and lack of meaningful alternatives.

5.     Plaintiffs' claims are barred, in whole or in part, because the Transfer Agreement lacked valid consideration. In the alternative, any purported consideration failed in whole or in part.

6.     Plaintiffs' claims are barred, in whole or in part, because the Transfer Agreement and the provisions Plaintiffs seek to enforce are procedurally and substantively unconscionable.

7.     Plaintiffs' claims are barred, in whole or in part, because Plaintiffs materially breached any enforceable obligations before any alleged breach by Defendant.

8.     Plaintiffs' claims are barred, in whole or in part, because Plaintiffs prevented, hindered, interfered with, or made impossible the performance they now claim Defendant failed to provide.

9.     Plaintiffs' claims are barred, in whole or in part, because Plaintiffs failed to satisfy conditions precedent to enforcement or recovery.

10.     Plaintiffs' claims are barred, in whole or in part, by waiver, estoppel, ratification, acquiescence, or consent.

11.     Plaintiffs' claims for equitable relief, including specific performance and injunctive relief, are barred by Plaintiffs' unclean hands.

12.    Plaintiffs' claims are barred, in whole or in part, because Plaintiffs suffered no cognizable damages caused by Defendant.

13.    Plaintiffs' recovery, if any, is barred or reduced because Plaintiffs failed to mitigate their alleged damages.

14.    Plaintiffs' claim for liquidated damages is barred, in whole or in part, because the alleged liquidated-damages provision is an unenforceable penalty or is otherwise invalid or unenforceable.

15.    Plaintiffs' claims for injunctive relief and specific performance are barred, in whole or in part, because Plaintiffs have not suffered irreparable harm and have an adequate remedy at law.

16.    Plaintiffs' claims are barred, in whole or in part, because the provisions they seek to enforce are illegal, contrary to public policy, or unenforceable as applied.

17.    Plaintiffs' claims based on alleged statements or communications are barred, in whole or in part, because the statements were true, substantially true, privileged, or protected by law.

18.    Plaintiffs' claims are barred, in whole or in part, because Plaintiffs cannot establish that Defendant caused the damages or harm they allege.

19.    Any recovery by Plaintiffs is barred, reduced, or subject to setoff or recoupment based on amounts owed to Defendant and damages caused by Plaintiffs' conduct.

20. Defendant reserves all defenses available under law or equity and reserves the right to amend or supplement these affirmative defenses as additional facts are discovered.

21. Plaintiffs' claims are barred, in whole or in part, because the Transfer Agreement and the provisions Plaintiffs seek to enforce lack mutuality of obligation. Among other things, the non-disparagement provision purports to bind only Defendant while imposing no reciprocal obligation on Plaintiffs, and the managerial and operational obligations Plaintiffs claim to have assumed are illusory in that they require no performance beyond what the Roblox platform provides as a matter of course.

22. Plaintiffs' claim for attorney's fees is barred, in whole or in part, because the Transfer Agreement is void, voidable, or unenforceable, rendering any fee-shifting provision therein of no force or effect, and because no independent statutory or common law basis for an award of attorney's fees exists.

## COUNTERCLAIM

### NATURE OF THE ACTION

1. Peter Innes was seventeen years old when he created *Forsaken*, one of the most popular games on the Roblox platform, attracting more than 84 million players and generating millions of dollars in revenue. This case is about how two trusted members of Peter's community management team, Eli Adams and Reyna Balboa, conspired to exploit a public crisis rooted in Peter's own childhood sexual abuse to steal *Forsaken* from him.

2. First, Adams and Balboa fraudulently seized control over Peter's community platform on Discord and banned him from it. Then, Counterclaim Defendants used their

control over that platform to unlawfully coerce Peter — a teenager just three months past his eighteenth birthday, in the vortex of a public crisis regarding the sexual abuse of Peter, and without legal counsel — into an agreement presented after midnight and signed five minutes later. The agreement's terms are so transparently exploitative and shocking to the conscience as to be unenforceable. Among other things, the agreement purports to allow Adams and Balboa to pay *Forsaken*'s Purchase Price with Peter's own money. Even that was never paid. Adams and Balboa now ask this Court to bless that result. Peter's counterclaims ask this Court, based on well-established principles of contract, tort, and equity, to undo it.

3. Roblox is one of the largest interactive entertainment platforms in the world, enabling independent developers like Peter to create, publish, and monetize games that are played by hundreds of millions of users around the world. Top-performing games on the Roblox platform generate millions of dollars in annual revenue for their creators.

4. Discord is a separate text and voice communication service: a community platform widely used by Roblox game developers to build and manage communities around their games. The Discord server for a game on Roblox is the primary channel through which developers like Peter communicate with players and coordinate with their development teams. Peter built the four Discord servers for *Forsaken,* including the following:

Forsaken Community Server: 1273022636053499914

Forsaken Appeals/Support Server: 1312345317378887790

Forsaken Indev Server: 1266945260400152586

Forsaken Old Dev Server: 1356054916401074206

(the "Forsaken Discord Servers" collectively or a "Server" or "Forsaken Discord Server" individually) into a community of more than one million members. It was the central hub through which he managed both the game's player community and its development team.

5.      In May 2025, a viral YouTube video accused Peter of distributing child sexual exploitation material, introducing the false public narrative that he was a child predator. In reality, Peter was himself a victim of sexual abuse and exploitation as a child..

6.      Peter had been a legal adult for less than two months when the video was published. The video triggered a wave of harassment, death threats, and coordinated abuse from *Forsaken's* millions of fans directed at Peter and his family. Adams and Balboa knew the important context of Peter's youth and victimization, but instead of correcting the public narrative, they exploited the controversy for personal advantage.

7.      On or about May 26, 2025, in the midst of the crisis over the YouTube video, Adams reached out to Peter's girlfriend, Ava Wesley, to inquire about stepping in to manage the Forsaken Discord Servers. Following up on Adams's inquiry with Ava Wesley, Peter asked Adams to temporarily manage the Forsaken Discord Servers.

8.      That trust did not arise by accident. Months earlier, when Peter first considered giving Adams limited moderator privileges over the Forsaken Discord Servers, he asked Adams to "pinky promise" not to abuse them, and Adams replied: "Pinky Promise."

9.      Adams explicitly and repeatedly promised in writing that the arrangement was temporary and that he would return control over the Forsaken Discord Servers to Peter.

25

Within minutes of receiving control, however, Adams banned Peter from the Forsaken Discord Servers and publicly announced, falsely, that he and Balboa were *Forsaken's* permanent owners.

10.     Adams' and Balboa's takeover of the Forsaken Discord Servers was not an isolated wrong. It was the first phase of a coordinated scheme to strip Peter of ownership of *Forsaken* itself. By taking control and banning Peter from the Forsaken Discord Servers, Adams and Balboa effectively severed Peter from both his development team and the community of players. Without access to the Forsaken Discord Servers, Peter could not effectively communicate with his team, manage the game, or sell *Forsaken* to the third-parties with whom he was discussing a sale.

11.     Counterclaim Defendants admitted publicly and in writing that they seized the Forsaken Discord Servers for the specific purpose of disrupting Peter's ability to sell *Forsaken.* Counterclaim Defendants created Peter's state of helplessness deliberately and then used it as leverage to coerce Peter into signing an instrument dated June 29, 2025 (the "Transfer Agreement"), a true and correct copy of which is attached as Exhibit A to Plaintiffs' Complaint[1], which purports to transfer Peter's rights to *Forsaken* on terms entirely of their choosing.

12.     The Transfer Agreement's purported terms are so one-sided that they are themselves evidence of a coercive, unlawful imbalance. As described in the Transfer

---

[1] Counterclaim Defendants filed the Transfer Agreement under seal and filed a Motion to Seal. Although Peter opposed the Motion to Seal, the Court granted the Motion Accordingly, pursuant to the Court's Order, Peter will not file the Transfer Agreement publicly unless and until the Court allows it.

Agreement, Adams and Balboa would acquire ownership of the Forsaken intellectual property and ███████████, with the purported Purchase Price to be paid to Peter from *Forsaken's* own funds: funds that Peter was simultaneously required to surrender to Adams and Balboa.

13.    In other words, Balboa and Adams, older and more experienced community members represented by counsel, coerced Peter, who was barely an adult and unrepresented, to sign an agreement where he would pay them to take away his rights. Such agreement is unconscionable, illusory, and unenforceable.

14.    Through these counterclaims, Peter seeks to invalidate or rescind the Transfer Agreement, recover control of the assets and revenues wrongfully taken from him, obtain damages for Adams and Balboa's misconduct, and secure an accounting of all *Forsaken* revenues generated during their control.

15.    Except where expressly alleged otherwise, Peter's references in these Counterclaims to the Transfer Agreement, its terms, or any action taken in connection with it are made for descriptive purposes only and do not constitute an admission that the Transfer Agreement is valid, enforceable, or binding. Peter's primary position, as set forth in Counts I and II, is that the Transfer Agreement is void or subject to rescission. Allegations made in the alternative, including those assuming the validity of the Transfer Agreement, are pleaded pursuant to Fed. R. Civ. P. 8(d).

**PARTIES**

16.    Defendant and Counterclaim Plaintiff Peter Innes is an individual domiciled in Hackensack, New Jersey. At all relevant times, Peter used the Discord usernames 'Soul',

27

'delta', and 'sunny' and is referred to by those usernames in the Discord communications cited herein.

17.     Plaintiff and Counterclaim Defendant Eli Adams is an individual domiciled in Lafayette, Louisiana. At all relevant times, Adams used the Discord username 'Hytoko' and is referred to by that username in the Discord communications cited herein.

18.     Plaintiff and Counterclaim Defendant Reyna Balboa is an individual domiciled in Vancouver, Canada. At all relevant times, Balboa used the Discord username 'Basil' and is referred to by that username in the Discord communications cited herein. Balboa is also known as @Cowoika on the social media platform X (formerly Twitter).

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over the copyright counterclaim pursuant to 28 U.S.C. §§ 1331 and 1338(a) because it arises under the Copyright Act, 17 U.S.C. § 101 et seq. This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(a) because complete diversity of citizenship exists between Counter-Plaintiff and Counterclaim Defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs. This Court has supplemental jurisdiction over Counter-Plaintiff's state law counterclaims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy and derive from a common nucleus of operative fact.

20.     Venue is proper in this District because these counterclaims arise from the same transaction or occurrence as Plaintiffs' claims.

## FACTUAL ALLEGATIONS

### I.   The Roblox and Discord Platforms

21.   Roblox Corporation owns and operates an online platform ("Roblox") that enables independent developers to create, publish, and monetize multiplayer video game experiences (each, an "Experience") played by hundreds of millions of users worldwide. Roblox monetizes Experiences through the sale of virtual currency ("Robux"), and developers earn a share of the Robux spent within their Experiences.

22.   A Roblox Group is a platform feature through which an Experience is controlled. Each Group is controlled by a designated account (the "Roblox Group Owner") with ultimate administrative authority over the Group. The Roblox platform automatically credits revenue generated by the Experience to the Group and distributes it according to allocations set by the Roblox Group Owner. Authority over both the operation of the Experience and the distribution of its revenue is vested in the Roblox Group Owner account.

23.   Under Roblox's terms, developers retain ownership of the original intellectual property they create, independent of any account or Group Owner status used to operate the Experience on the platform.

24.   Roblox Group Owner status can be transferred to another account, at which point the transferee assumes full administrative authority. There is an active market in which Roblox Experiences, Group Owner status, and associated revenue streams are bought and sold. Roblox users may convert Robux to U.S. dollars through Roblox's Developer Exchange program ("DevEx").

25.    Discord, Inc. operates an online communication platform on which users create and manage community servers (each, a "Discord Server"), controlled by an owner (the "Discord Server Owner") with authority to admit or ban members, assign roles, and transfer ownership to another user. A successful Discord Server is a valuable intangible asset that cannot be readily replicated or replaced.

## II.    Peter's Creation of *Forsaken*

26.    Peter was born in March 2007 and turned eighteen in March 2025. Adams and Balboa are both years older than Peter.

27.    Between August 2024 and December 25, 2024, Peter conceived, developed, and created the Roblox Experience "Forsaken," contributing original designs, source code, art, and other creative content, including the character 'Chance,' a fictional character original to *Forsaken*.

28.    As of December 25, 2024, Peter was the owner of the intellectual property comprising *Forsaken* [ID: 18687417158] and solely owned and controlled the Roblox Group Owner account associated with *Forsaken* as well as the Forsaken Discord Servers.

29.    On December 25, 2024, Peter published *Forsaken* on the Roblox platform.

30.    Peter is the author and copyright owner of the original works of authorship embodied in *Forsaken*, including its source code, character designs, artwork, and other creative elements. Peter has registered the following works with the United States Copyright Office: (1) *Forsaken* (Video Game), Registration No. PA-2-582-508, effective May 6, 2026; and (2) *Forsaken* – Source Code, Registration No. TXu 2-540-881, effective May 5, 2026.

31.     Peter is the owner of the FORSAKEN trademark and associated brand assets, which he has used in commerce since December 25, 2024. The FORSAKEN mark has become distinctive and associated with Peter as the source of the *Forsaken* gaming experience.

32.     Since its release, *Forsaken* has attracted more than 84 million unique players, including – at times – more than 100,000 concurrent players, generating more than 4.4 billion total play sessions and more than $3.8 million dollars' worth of Robux that Roblox Corporation distributed into the Forsaken Roblox Group.

33.     *Forsaken* was Peter's primary source of income, and he depended on the revenue it generated.

34.     Between December 25, 2024 and May 2025, the Forsaken Discord Servers grew to more than one million users and was the primary means Peter used to communicate with the Forsaken community and with individuals contributing to *Forsaken* and its community.

35.     The Forsaken Experience and associated intellectual property, the Forsaken Roblox Group and associated Roblox accounts (including the account known as the "Spectre Account," as defined below), the Forsaken Discord Servers, and the revenues, proceeds, and other economic benefits generated therefrom are referred to collectively herein as the "Forsaken Property." At all times prior to May 26, 2025, Peter was the sole owner of all Forsaken Property.

36.     At all relevant times, Adams and Balboa were members of the Forsaken Discord Servers, players of *Forsaken*, and trusted members of the community surrounding

the game. Peter knew and trusted them, and Adams in particular had positioned himself as a confidant and source of support to Peter.

## III.    The Public Crisis

37.    On or about May 20, 2025, the YouTube user FuwattiProductions published a video titled "No, Souldrivenlove is NOT Innocent" on YouTube containing false and defamatory claims about Peter (the "YouTube Video").

38.    The YouTube video repeatedly demanded that Peter disassociate from *Forsaken* and the Forsaken Discord Servers.

39.    The YouTube Video garnered 229,000 views on YouTube and led to a viral proliferation of additional videos and social media posts by numerous users, generating millions of impressions, repeating the defamatory claims and demanding Peter disassociate from *Forsaken* and the Forsaken Discord Servers.

40.    Adams and Balboa were aware of the true context of the events described in the YouTube Video, including that the alleged conduct occurred when Peter was thirteen years old and was the result of his own victimization by an older individual. Notwithstanding that knowledge, Adams and Balboa chose to exploit the public controversy for personal gain rather than correct it.

41.    The viral proliferation of the YouTube Video and related content is global in scope and has reached millions of people worldwide. As a direct result of the YouTube Video and its viral proliferation, Peter received numerous death threats, was subjected to coordinated online harassment campaigns, and endured sustained abuse continuing through the present.

42.     Peter suffered severe emotional distress as a direct and proximate result of Defendants' conduct, including severe anxiety, depression, and panic attacks for which he sought mental health treatment.

43.     Peter's standing in the Forsaken community was under direct assault, and the Forsaken Discord Servers was his primary means of communicating with that community to respond to the allegations against him. His ability to defend his reputation depended on his continued access to the Forsaken Discord Servers.

44.     Peter's emotional state significantly impaired his judgment and decision-making capacity and his ability to think clearly during the period in which the purported agreements transferring control over *Forsaken* and the Forsaken Discord Servers occurred, rendering him particularly vulnerable to coercion and undue influence.

## IV.    The Discord Server Seizure and Pressure Campaign

45.     At all times before May 26, 2025, Peter exercised sole ownership and control over the Forsaken Discord Servers.

46.     On January 15, 2025 Peter discussed a Moderator role on the Forsaken Discord Servers with Adams, and Adams promised not to abuse the powers delegated to him.

> **Soul [Peter] 1/15/2025 5:50 PM:** *"...ok so do u pinky promise not to abuse anything if u were to be a moderator."* [sic]
>
> **Hytoko [Adams] 1/15/2025 5:54 PM:** *"Pinky Promise"*

47.     A Moderator role on a Discord server confers limited administrative privileges, such as the ability to mute or ban users. Those privileges remain at all times

subordinate to the server owner, who can reverse a moderator's actions and revoke the moderator's privileges at any time. Peter's grant of moderator authority on the Forsaken Discord Servers did not confer ownership and control over the Servers to Counterclaim Defendants.

48.    In the wake of the controversy and harassment over the YouTube Video, Counterclaim Defendant Adams reached out to Peter's girlfriend, Ava Wesley, to inquire about stepping in to manage the Forsaken Discord Servers. Following up on that inquiry, on May 26, 2025, Peter contacted Counterclaim Defendant Adams through Discord, agreeing to accept his assistance in temporarily managing the Forsaken Discord Servers.

49.    In that conversation, Counterclaim Defendant Adams promised Peter that he would return control, and Peter transferred control over the Forsaken Discord Servers in reliance on that promise:

> **Soul [Peter] 5/26/2025 3:44 PM:** *"do u think i could temporarily give u ownership of the discord servers & stuff"*
>
> **Hytoko [Adams] 5/26/2025 3:45 PM:** *"I'd be down to cover everything if you guys need / Just for a while / While you guys get things sorted"*
>
> **Soul [Peter] 5/26/2025 3:45 PM:** *"I feel like it'd be best if we publicly shifted ownership around for a bit / so that nobody's getting harassed n whatnot"*
>
> **Soul [Peter] 5/26/2025 3:46 PM:** *"just please promise me that it wont be permanent"*
>
> **Hytoko [Adams] 5/26/2025 3:46 PM** *"Iïd still allow you to work in the background obviously"*
>
> **Soul [Peter] 5/26/2025 3:46 PM:** *"i don't want to be abandoned / just please promise me that it wont be permanent"*

34

> **Hytoko [Adams] 5/26/2025 3:46 PM:** *"It wonít be / Genuinely / I want to be fully honest / I could not run this forever / All I ask is that / You guys stick to working in the background for a while / Just / To clear all this up and such / You have my word soulÖ"*
>
> **…**
>
> **Soul [Peter[ 5/26/2025 3:47 PM:** *"ill go transfer ownership of stuff over to you now…"*

50.    As part of the May 26, 2025 Discord conversation, Counterclaim Defendant Adams requested that Counterclaim Defendant Balboa join him as a "temp co-owner," reiterating the understanding that Adams' control over the Forsaken Discord Servers was temporary and demonstrating his intent to coordinate his activities with Balboa.

> **Hytoko [Adams] 5/26/2025 3:48 PM: "…**I did wanna ask / Are you fine is Basil* [Defendant Balboa] *helps me as well? Almost like a temp co-owner as well?"*
>
> **Soul [Peter] 5/26/2025 3:49 PM:** *"mhm, i dont mind / i just really really really dont wanna. have this be a permenant thing"*
>
> **Hytoko [Adams] 5/26/2025 3:50 PM:** *"…*It isnít soul / I promise you this"

51.    Within minutes of receiving control of the Forsaken Discord Servers, Adams began his coordinated effort with Balboa to seize complete administrative, creative, and financial control over *Forsaken* itself:

> **Hytoko [Adams] 5/26/2025 3:50 PM:** *"…You both would work in the background while Basil and I act as the faces temporarily"*
>
> **Soul [Peter] 5/26/2025 3:51 PM:** *"…is it alright if we* [referring to Peter and Peter's girlfriend Ava Marie Wesley] *keep total ownership of the holder account for the group though ? its just for our own comfort"*

**Hytoko [Adams] 5/26/2025 3:52 PM:** *"Does that involve payouts and such? Basil was mainly hoping for the code so she could more effectively do stuff when it comes to payouts?"*

**Hytoko [Adams] 5/26/2025 3:52 PM:** *I do wanna ask like / Ahead of time as well / Would you be alright like / In a day or so / With me bringing a few modelers on? Mainly a dedicated clothing person…"*

**Hytoko [Adams] 5/26/2025** 3:55 PM: *Just a question from Basil*

**Soul [Peter] 5/26/2025 3:57 PM: "***uuhh / why would u need the / email"*

**…**

**Hytoko [Adams] 5/26/2025 3:58 PM:** *"I think just / Weíre both really worried about there being any traces of you guys still owning the game right now / That people could look into / It would also speed up things like payment and such butÖ / Iíll leave this choice up to you Soul*

52.    As Peter expressed concerns about the powers he was trusting to Defendants,

Adams continued to provide reassurance that the arrangement would be temporary:

**Soul [Peter[ 5/26/2025 4:00 PM:** *"Im rlly just not comfortable abt the email being handed out because i srsly do not wanna get left behind & abandoned…i just dont want to get tossed away"*

**Hytoko [Adams] 5/26/2025 4:05 PM:** *"Thatís okay / Genuinely I understand that perfectly/ Youíre fears are expected and such, I donít doubt that this is like / A genuinely terrifying decision for tot in the first place / And while you trust me, this is almost like handing someone your child for several months"*

…

**Soul [Peter] 5/26/2025 4:09 PM:** *"...idk im just scared / i dont wanna be replaced"*

**Hytoko [Adams] 5/26/2025 4:12 PM:** *"I promise you we won't replace you / I know words only mean so much / but I and Basil have no plans on that being the case / if anything we genuinely just want you guys to both have time to / well / finally be able to rest / get things organized and put together / and so on / Basil is only worried as the code is something she needs pretty heavily I know it's probably stupid to say this but...you can trust me soul"*

53.    On May 26, 2025 at 4:28 p.m. – just over 15 minutes after stating that "you can trust me soul" – Adams permanently removed Peter from the Forsaken Discord Servers, and posted a message to the entire Server, falsely announcing that Peter had transferred the Forsaken Property to Defendants to the Forsaken community (the "Adams Announcement").



54. Adams went on to post this message through additional social media channels, falsely claiming that Counterclaim Defendants were the rightful owners of the Forsaken Property.

55. Just over two hours after Adams released his false announcement and banned Peter from the Forsaken Discord Servers, Adams and Balboa make clear they have no intention to return it:

> **Basil [Balboa] 5/26/2025 6:16 PM:** *"very uncomfortable conversations that need to be addressed / because dude / i did not know this was going to be temporary"*
>
> **Soul [Peter] 5/26/2025 6:19 PM:** *"its just really scary for me / i dont want to be thrown away"*
>
> **Basil [Balboa] 5/26/2025 6:20 PM:** *"i cant / like it doesnt sit right / its concerning /and we cant have that sort of reception reflecting the team if you understand that…"*
>
> …
>
> **Basil [Balboa] 5/26/2025 6:21 PM:** "*its not going to ease things up much, its just going to clarify and go into some more things"*
>
> **Basil [Balboa] 5/26/2025 6:22 PM:** *"i will forever be grateful for all the opportunities youve given me, and i cannot just speak for myself but everyone else youve helped as well / but you need to realize that this could damage all of us / nothing that ignoring/toughing it out can solve / nothing that money could / ever solve / we have a lot of people counting on us to change things"*

56. Counterclaim Defendants used the public impact of Adams' false announcement to corner Peter, falsely claiming that retracting their lies would damage *Forsaken*. By seizing the Discord Server, Peter's primary means of communicating with the Forsaken community and contributors, Counterclaim Defendants manufactured a crisis

38

placing Peter under severe economic duress and they knew he could not effectively operate, manage, or sell the *Forsaken* without access to the Discord Server. Counterclaim Defendants explicitly cited the commercial benefits of their seizure, with Counterclaim Defendant Balboa adopting these statements:

> **Hytoko [Adams] 5/26/2025 6:24 PM:** "*The second the announcement came out / So much shit cleared up. Like / Relations with others games began to flow like a river / We cannot mess this up now / This is genuinely our one shot to turn things around*"

> **Hallowote10K 5/26/2025 6:25 PM:** "*that is part of the reason on why this thing cant really be temporary / we already made the announcement / cant go takesie backsie*"

> **Basil [Balboa] 5/26/2025 6:25 PM:** "*^* [indicating agreement] / *people are seeing this as a permanent change*"

57. As this conversation over the control of the Forsaken Property played out, Peter shared the extraordinary emotional and psychological strain he was under, stating:

> **Soul [Peter] 5/26/2025 6:27 PM:** "*i wish i knew more of what to say / ive been sweating in my car even tho the acís blasting and there r so many ppl calling me*"

58. Despite Peter's plea for help and patience during a public crisis, Counterclaim Defendants continued applying pressure to Peter, insisting that he turn over control of *Forsaken* itself, including the "Spectre Account" (the Roblox account with username @forsakendeelopment, as defined in the Transfer Agreement, which controlled the Forsaken Roblox Group):

> **Soul [Peter] 5/26/2025 6:38 PM:** "*i dont know / i need some time if / thats okay*"
>
> **…**

39

**Hytoko [Adams] 5/26/2025 6:39 PM:** *"You can have time, but Basil and I need the information…Need the information to the specter account"*

**Basil [Balboa] 5/26/2025 6:39 PM**: *"i have it but /i need 2fa access"*

59.    On May 27, 2025, Peter shared with Counterclaim Defendants the ongoing harassment and abuse he continues to face resulting from of the YouTube Video and the Adams Announcement:

**Soul [Peter] 5/27/2025 11:40 AM:** *"in the past 24 hours alone my family & i have been receiving non-stop phone calls, hate mail, threats, and unpaid pizza deliveries for everything"*

…

**Soul [Peter] 5/27/2025 11:40 AM:** *"in the car yesterday my sister called me and said people were even leaving hateful comments under my school's instagram account"*

60.    On May 27, 2025, Peter's girlfriend, Ava Marie Wesley, demanded the return of the Forsaken Discord Servers. Adams refused to return it. Instead, Adams claimed he didn't want to return it and wasn't able to because, in direct violation of his agreement with Peter, he had already transferred it to Balboa.

**Ava [Wesley] 5/27/2025 11:43 AM:** "we just want the discord back"

**Hytoko [Adams] 5/27/2025 11:43 AM:** *"ownership transfer is permannet as statedint ehir tos... i cant giveit back beecause notonly do inotwant to buti dontrown it Basildoes"*

61.    Adams's invocation of the Discord Terms of Service was a knowing and intentional falsehood. Ownership transfer of a Discord Server is not permanent, which is plainly demonstrated by Adams' own transfer of the Server to Balboa. Adams' statements

40

and false invocation of the platform terms of service demonstrate that his refusal to return the Server was not due to any technical or platform limitation, but was a deliberate act of conversion and an intentional breach of the obligations he expressly undertook when he received control over the Server. Adams' manufactured excuse less than 24 hours after the Forsaken Discord Servers transfer further evidences that Adams's initial promise of a "temporary" transfer was a fraudulent inducement designed to permanently strip Peter of his property.

62.    As a result of Counterclaim Defendants' refusal to return the Discord Server, Peter was stripped of administrative control over his own community platform and severed from his primary means of communicating with *Forsaken*'s player base and contributors, making it impossible to continue managing, administering, and updating *Forsaken*.

## V.    The Coordinated Campaign

63.    The wrongful seizure and conversion of the Forsaken Discord Servers was the first phase of Counterclaim Defendants' coordinated campaign to strip Peter's ownership of the Forsaken Experience. Having obtained control of the Discord Server through fraud, Counterclaim Defendants immediately deployed that control as a strategic weapon: they withheld the Server to prevent Peter from selling or transferring *Forsaken* to any third party, thereby isolating Peter financially and cornering him into surrendering the Forsaken Experience directly to Counterclaim Defendants on their terms.

64.    On May 28, 2025, Adams admitted in writing that Counterclaim Defendants had intentionally converted the temporary bailment of the Forsaken Discord Servers into a permanent transfer after taking control of the Server.

> **Hytoko [Adams] 5/28/2025 3:48 PM:** *"it was supposed to only be temp ownership but once all us leads realized how fucked that would be we tried discussing it as permannet"*

65.     On May 28, 2025, in an X post that received over 34,000 impressions, Balboa admitted that Counterclaim Defendants converted the Forsaken Discord Servers specifically to prevent Peter from selling *Forsaken* and to enable their interference with transactions Peter was discussing with a viable third-party purchaser:

> **Basil [Balboa]** 5/28/2025 1:18 AM: *"We got news of Soul* [Peter]…*wanting to sell the game and have been attempting to withhold this transaction all day. I was in a call with said party that was acquiring the game…but the general consensus was we were still going to withhold the server to try and attempt to stop any sort of transaction from going through."*

66.     In the same X post, Balboa also falsely claimed that Peter had stolen funds from the Forsaken Roblox Group and turned it over to a third party under a written contract.

> **Basil [Balboa] 5/28/2025 1:18 AM: "**[Soul] *decided to take a LARGE amount of our funds from our group and just hand it off to the new folks in charge. This includes signing legal contracts as well.*"

67.     In fact, the funds Balboa described as "our funds" belonged entirely to Peter. No agreement, document, or instrument of any kind gave Adams or Balboa any right, title, or interest in *Forsaken* or its revenues as of May 28, 2025. Balboa's public claim of ownership over Peter's funds and Peter's game reveals the true nature of Adams and Balboa's conduct: using every lever available to coerce Peter into transferring control and economic benefit in *Forsaken* to themselves without paying any of their own money. Almost immediately after Adams and Balboa seized control of the Discord Server, they began coordinated efforts to pressure Peter into surrendering control of the Spectre

42

Account: a Roblox Account that effectively controlled *Forsaken* on Roblox and its financial accounts worth millions of dollars in Robux (the "Spectre Account"). When Peter begged for time to process the overwhelming situation, Counterclaim Defendants refused to relent:

> **Hytoko [Adams] 5/26/2025 6:39 PM:** *"You can have time, but Basil and I need the information... Need the information to the specter account"*
>
> **Basil [Balboa] 5/26/2025 6:39 PM:** *"i have it but i need 2fa access"*

68.     Adams' and Balboa's immediate and aggressive insistence on gaining access to the Spectre Account reveals their objective was never to help Peter through a crisis, but to acquire permanent ownership and economic control of *Forsaken* for themselves.

69.     Throughout this period, Adams and Balboa systematically exploited Peter's expressed fears and vulnerabilities to coerce and manipulate him into turning over *Forsaken* to them. When Peter pleaded "i don't want to be thrown away," expressing his deepest fear of abandonment during a psychological crisis, Counterclaim Defendants provided false reassurances while demanding the keys to an asset of life-altering value. While promising to be responsible stewards of the Forsaken community, they were working to poison his reputation with the Forsaken community and his discussions with business partners and investors.

## VI.    The Transfer Agreement

70.     Prior to Adams' and Balboa's seizure of the Forsaken Discord Servers, Peter was in discussions with prospective purchasers of the Forsaken intellectual property rights

through a third party, Ethan Forbes. Through Forbes, Peter received and considered proposals for third parties (the "Prospective Buyers") to acquire *Forsaken* at valuations ranging from approximately $8 million to tens of millions of dollars. Adams and Balboa were aware of these discussions and deliberately disrupted them by withholding the Discord Server. In fact, Balboa publicly admitted disrupting these discussions was Counterclaim Defendants' purpose and intent and that their control over the Server was the coercive instrumentality they used to do it. According to Balboa's public posting to X on May 28, 2025: "the general consensus was we were still going to withhold the server to try and attempt to stop any sort of transaction from going through."

71.     Adams and Balboa also worked to dismantle Peter's relationship with Forbes directly. On or about June 18, 2025, with knowledge of Peter's relationship with Forbes, Adams told Peter it was "[r]eally predatory," and urged him to alter or terminate it.

72.     Adams offered to bring Peter "in the loop with both our lawyer." That is, Adams and Balboa's own counsel. Plaintiff's Complaint now recasts the introduction to their own counsel as having given Peter "access to counsel," citing it as evidence that the Transfer Agreement was freely negotiated. But the counsel to whom the Complaint refers was formally engaged to represent Adams and Balboa on the Transfer Agreement and drafted it on their behalf. In fact, Neither Adams nor Balboa ever introduced Peter to counsel that could have ethically advised him on the Transfer Agreement, and he was never represented by any counsel in connection with the Transfer Agreement.

73.    Although agreements of this kind commonly recite that each party has had the opportunity to consult independent legal counsel of its own choosing, the Transfer Agreement, drafted by Adams and Balboa's counsel, contains no such recital as to Peter.

74.    Having seized Peter's primary means of communicating with the Forsaken community and his development team, and having refused to return it, Adams and Balboa held the leverage they needed to achieve their goal of controlling *Forsaken* for themselves. For the month that followed, Peter remained locked out of his own community while Adams and Balboa controlled it. They used control over the Forsaken Discord Servers to exercise operational control over *Forsaken* and to direct the *Forsaken* development and support team to cease working on the game and supporting the community, applying even more coercive pressure.

75.    Peter had no reasonable means of escaping the situation Adams and Balboa had created. As long as Adams and Balboa controlled the Forsaken Discord Servers and directed the activities of the development, community, and support teams, Peter could not operate or manage *Forsaken*, sell or transfer it to anyone else, or organize the team for a new project. The only way to keep *Forsaken*, and the income he depended on, going was to go along with Adams' and Balboa's plans.

76.    Throughout the period from May 26 through June 29, Adams continued to manipulate Peter: offering to handle legal complications, presenting himself as Peter's protector, and cultivating Peter's reliance on him while simultaneously working to convert Peter's temporary crisis into a permanent transfer of his property. Adams and Balboa knew that Peter needed their cooperation given the control they had over the Discord Servers.

77.    Having already secured unlawful control over his community and his development team, Counterclaim Defendants used that control and dependence to corner Peter. It was against this backdrop — newly eighteen years old, without counsel, panicked and terrified, isolated from his team, severed from his players, and enduring sustained public harassment arising from a viral YouTube Video that weaponized his childhood sexual abuse — that Peter executed the written Forsaken Transfer Agreement (the "Transfer Agreement") on June 29, 2025.

78.    Before signing, Peter sought a measure of protection against the permanent loss of *Forsaken*. He identified that the draft contained no provision returning *Forsaken* to him upon termination and asked Adams to add one. Adams responded that the provision had been omitted by his counsel and would be added.

79.    The provision that Adams' counsel then added gave Peter no protection at all. It provided only that ███████████████████████████████████████ ████████████████████████████████████." (Agreement § 10(a)). Reversion thus depended entirely on Adams and Balboa's unilateral decision to terminate; the Agreement provided for no right to terminate, to demand reversion, or to recover *Forsaken* under any circumstance. The one protection Peter asked for, and was told he would receive, was illusory.

80.    Believing he could trust Adams, Balboa, and the lawyer they referred to, Peter signed the Transfer Agreement after midnight, just minutes after this exchange.

81.    The Transfer Agreement recites that, ███████████████████ Peter's transfer of all rights in *Forsaken*, Adams and Balboa would provide three things: (a)

assumption of managerial and operational responsibilities; ████████████████

██████████████████████████████████ (Agreement § 2) Each purported

form of consideration was illusory, circular, or a reduction of rights Peter already held. In

substance, Adams and Balboa acquired a multimillion-dollar enterprise without parting

with anything of their own.

82.     The ████████ one-time fee was not Adams and Balboa's money. By the

agreement's own terms, this payment was "to be paid out of the Roblox Group."

(Agreement § 2(b)) But the Roblox Group from which such funds came was Peter's

property. Plaintiffs admit as much in their Complaint, alleging that Peter "would walk away

with $350,000 from the game's operating capital." (emphasis added). That is, Adams and

Balboa submitted a binding admission to this Court that the so-called "Purchase Price"

wasn't their money.

83.     The one-sidedness of that exchange is even starker in light of what the

Transfer Agreement conveyed. The Agreement itself recites that the ████████████

██████████████████████████████████ at the prevailing

conversion rate of $0.0035 per Robux, and Forsaken carried no debt. Even treating the

recited ████████ Purchase Price as Adams and Balboa's own money (their own Complaint

admits it was not), and even assuming Peter had received it (he did not), the "deal" Adams

and Balboa struck was the acquisition of a multimillion-dollar enterprise holding more than

████████ in liquid funds, for less than one-third of the value of those funds alone.

84.     Nor was the promised "████████████████████" consideration flowing

to Peter. (Agreement § 2(c)) Before the Transfer Agreement, Peter owned *Forsaken* and

47

the entire revenue stream it generated, which he could direct and distribute as he saw fit. The Transfer Agreement does not actually provide any new payment rights for Peter; instead, it stripped him of a portion of his rights. A promise to pay Peter a portion of the income that was already his is not consideration: it is a reduction of his rights dressed up as a benefit.

85.     Finally, Adams and Balboa's purported assumption of managerial and operational responsibilities imposed no obligation on them at all. (Agreement § 2(a)) By its terms, Section 2(a) extends only to the "Assets" listed on Exhibit A to the Transfer Agreement — the Forsaken Roblox Experience, the Forsaken Roblox Group, and the associated Roblox accounts; it imposes no obligation with respect to the Forsaken Discord Servers, which are not among the Assets. The Roblox platform automatically hosts and operates the Assets and the Experience, credits revenue to the Roblox Group, and distributes revenue regardless of who the owner is; there is no other way to manage or operate a Roblox Experience. Adams and Balboa therefore did not promise to do anything that Roblox was not already going to do regardless of the Transfer Agreement. A promise that requires no performance is illusory and constitutes no consideration.

86.     No other provision of the Transfer Agreement required Adams and Balboa to pay, deliver, or perform anything for Peter. Every other term of the Transfer Agreement either imposed obligations on Peter, stripped him of rights, or disclaimed obligations of Adams and Balboa.

87.     Beyond the absence of consideration, the Transfer Agreement's terms ran in only one direction. Peter surrendered all ownership of *Forsaken* and was barred from

48

making any use of his own creation, while Adams and Balboa took the exclusive right to exploit it ███████████████████ Peter alone was bound by a ███████████ ██████████████████; Adams and Balboa undertook no reciprocal duty. Peter alone was required to █████████████████, and to ██████████████████████████ ██████████████████████ Every term imposed obligations or surrendered rights on Peter's side alone. (Agreement §§ 3, 6, 8(b), 9)

88.    The Transfer Agreement describes a transaction wholly disconnected from *Forsaken*'s value. Through Forbes, Peter had received proposals to acquire *Forsaken* valued from approximately $8 million to as much as $75 million. The Transfer Agreement also would give Forsaken's new owner █████████████████████████████████ ██████. Adams knew this: he had asked Peter what he expected from a sale, and when Peter answered that offers ran as high as $42 million, Adams replied, "i cant pay that at all."

89.    Unable to compete with those offers, Adams and Balboa did not outbid them: they destroyed them. They seized the Discord Server to block any sale and then used Peter's resulting vulnerability to leverage him into transferring *Forsaken* for nothing of their own.

## VII.    Post-Signing Conduct

90.    Following the signing of the Transfer Agreement, Peter transferred control of the Forsaken Roblox Group and provided Adams and Balboa with credentials to the associated accounts, including the Spectre Account. Adams and Balboa assumed operational control of *Forsaken* and have operated it and collected its revenues since; Peter has not had operational control of *Forsaken* since.

91.    Peter transferred the ████████████████████████ recited in Section 2(b) of the Transfer Agreement into the Spectre Account. In the period after the transfer a portion of the *Forsaken* revenues was likewise credited in Robux to that account. However, once Peter surrendered the Spectre Account login information to Adams and Balboa, they changed the login information so he could no longer access it. As a result, Peter has never received the ████████████████████████████████████████████.

92.    Beginning on or about July 15, 2025, *Forsaken* ████████████████ were instead directed to the @vinyl_1337 account, an account Peter controlled. That redirection did not cure the harm: as alleged below, Roblox blocked Peter from converting the Robux credited to the @vinyl_1337 account into U.S. dollars through DevEx, and the block was not lifted until after Peter's counsel sent a demand letter in March 2026, leaving even those funds unusable for approximately ten months. And the ██████████████████ ████████████████ at issue: if the Transfer Agreement is void or rescinded as alleged herein, Peter was and is entitled to all of *Forsaken*'s revenues, ████████████ ████████████.

93.    To this day, Peter has never been paid the $████████████████ recited in Section 2(b) of the Transfer Agreement.

94.    Since assuming control, Adams and Balboa have continued to publish and operate *Forsaken* under the FORSAKEN name and marks, to use and build upon the source code, character designs, artwork, and other creative works embodied in *Forsaken*, to release new content derived from those works, and to collect and retain the revenue *Forsaken* generates.

95.    Adams and Balboa's use of the Forsaken name and marks in commerce is inseparable from their control over the Group, the related Roblox accounts, the Forsaken Discord Servers and associated accounts through which *Forsaken* is published, promoted, administered, and monetized.

96.    After Adams and Balboa assumed operational control of *Forsaken*, Roblox blocked Peter from using DevEx to convert Robux to U.S. dollars from the @vinyl_1337 account. The block was later lifted only after an attorney representing Peter sent a demand letter to Adams' and Balboa's counsel. Counsel for Adams and Balboa has represented to Peter's counsel that Adams and Balboa communicated with Roblox concerning *Forsaken* and its associated accounts, but has not provided a copy of that communication, and Peter does not know its contents or what action Roblox took in response. On information and belief, Adams and Balboa's communications with Roblox caused or contributed to Peter's inability to access funds through DevEx from the @vinyl_1337 account.

97.    On information and belief, Adams and Balboa have filed or are in the process of filing applications with the United States Patent and Trademark Office to register the FORSAKEN mark, based on their purported use of the mark in commerce.

98.    On information and belief, Adams and Balboa have deleted Discord communications concerning the events described in these Counterclaims, including server chat logs as well as direct messages and group chats that were not part of the Forsaken Discord Servers.

## VIII.  Concerted Action

99.     Each Counterclaim Defendant had full knowledge of, knowingly participated in, and substantially assisted the tortious conduct of the other. They executed their scheme by tag-teaming Peter in group communications; for instance, on May 26, 2025, Adams demanded that "Basil and I need the information... to the specter account," and Balboa immediately followed up by demanding the Two-Factor Authentication access. Furthermore, Balboa publicly endorsed and furthered their joint extortion scheme on May 28, 2025, publishing a statement that "the general consensus was we were still going to withhold the server" to sabotage Peter's attempts to exercise his intellectual property rights. By knowingly accepting administrative control of the server and using it as collective leverage, Balboa knowingly joined in and substantially assisted Adams's fraudulent inducement, and both Counterclaim Defendants reinforced and facilitated the other's coercive conduct.

100.    Following their wrongful seizure of the Forsaken Property, Counterclaim Defendants exercised joint dominion and control over said assets. Balboa publicly confessed to this joint dominion, stating on May 28 that "we owned the server." Balboa assumed ownership of the Discord Server at Adams's direction, while both Counterclaim Defendants participated in the management and exploitation of *Forsaken*. Counterclaim Defendants made joint decisions regarding the operation of the Forsaken Experience and the disposition of revenues generated therefrom, functioning as partners in the ongoing exploitation of Peter's property. Each Counterclaim Defendant received monetary benefit from *Forsaken* revenues generated during their wrongful control.

101.   Upon information and belief, Counterclaim Defendants allocated and/or diverted portions of revenues derived from *Forsaken* to third parties through the Roblox Group revenue system.

## COUNT I
### Declaratory Judgment – Transfer Agreement Void *Ab Initio*

102.   Peter repeats and realleges each of the preceding paragraphs as if fully set forth herein.

103.   An actual and justiciable controversy exists between Peter and Adams and Balboa concerning the validity of the Transfer Agreement and the parties' respective rights in *Forsaken*. Adams and Balboa contend the Transfer Agreement is valid and enforceable; Peter contends it is void and of no legal effect.

104.   The Transfer Agreement is void *ab initio* for lack of consideration. None of the three forms of consideration it recites conferred any benefit on Peter or imposed any obligation on Adams and Balboa: the ▮▮▮▮▮ was payable from Peter's own funds; the ▮▮▮▮▮▮▮▮▮ was a reduction of the revenue Peter already owned; and the assumption of managerial and operational responsibilities in and to the Assets listed on Exhibit A was illusory because the Roblox platform performs those functions automatically. No other provision required Adams and Balboa to pay, deliver, or perform anything of value for Peter.

105.   Peter is entitled to a declaration under 28 U.S.C. § 2201 that the Transfer Agreement is void, unenforceable, and of no legal effect, and that Peter retains all right, title, and interest in *Forsaken*.

## COUNT II
### Recission – Transfer Agreement
### (Alternative to Count I)

106.   Peter repeats and realleges each of the preceding paragraphs as if fully set forth herein.

107.   In the alternative to Count I, and in the event the Court determines that the Transfer Agreement formed and is voidable rather than void, Peter is entitled to rescission on any of the four independent grounds set forth below:

A.     Fraud in the Inducement

i.     On May 26, 2025, Adams represented to Peter in written messages through Discord that Peter's transfer of control over the Forsaken Discord Servers would be temporary and Adams would return control of the Server to Peter. Adams made those representations with no present intention of performing them and they were made to induce Peter to surrender the Server. Peter justifiably relied on them, and Adams and Balboa then used their wrongfully obtained control of the Server to coerce Peter into executing the Transfer Agreement. The Transfer Agreement was procured by fraud and should be rescinded.

B.     Duress

i.     The Transfer Agreement was procured by duress. Adams and Balboa committed unlawful acts, including the fraudulent seizure and conversion of the Forsaken Discord Servers, tortious interference with Peter's prospective transactions to sell Forsaken, and the publication of false and defamatory statements about Peter, as alleged above. That unlawful conduct deprived Peter of the unfettered exercise of his free will and

judgment and left him no reasonable alternative to executing the Transfer Agreement on the terms Adams and Balboa dictated. The unlawful conduct induced Peter to execute the Transfer Agreement. The Transfer Agreement is therefore voidable and should be rescinded.

C.    Unconscionability

i.    The Transfer Agreement is unconscionable, both procedurally and substantively, and was unconscionable at the time it was made.

ii.    The Transfer Agreement is procedurally unconscionable. Peter lacked any meaningful choice as to its terms. As set forth above, Adams and Balboa's control over the Forsaken Discord Servers gave them superior bargaining power, the Transfer Agreement was drafted by their counsel and presented to Peter, a teenager who was without counsel of his own, after midnight, and during an acute personal and financial crisis, and Peter had no meaningful opportunity to negotiate its terms or to obtain independent legal advice before signing.

iii.    The Transfer Agreement is substantively unconscionable. Its terms are unreasonably and oppressively favorable to Adams and Balboa: the recited consideration conferred nothing of value on Peter; Peter surrendered all ownership of *Forsaken* and was barred from any use of his own creation; Adams and Balboa obtained the exclusive right to exploit *Forsaken* at their sole discretion; Peter alone bore perpetual non-disparagement and indemnification obligations with no reciprocal duty on Adams and Balboa; and the sole protection Peter requested was illusory, operative only at Adams and Balboa's unilateral discretion.

55

iv.    Under Minnesota's sliding-scale analysis, the degree of procedural and substantive unconscionability present here renders the Transfer Agreement unenforceable. The Transfer Agreement should be rescinded.

D.    Failure of Consideration

i.    In the alternative, and assuming the Transfer Agreement formed with adequate consideration, Adams and Balboa have wholly failed to perform the consideration recited in the Agreement. The ██████ recited in Section 2(b) has never been paid to Peter. Adams and Balboa's failure to deliver the principal monetary consideration recited in the Transfer Agreement constitutes a total failure of consideration that independently entitles Peter to rescission.

108.    On each of the foregoing independent grounds, Peter is entitled to rescission of the Transfer Agreement, restoration of the parties to their pre-agreement positions, and return of Forsaken and all associated assets and revenues wrongfully obtained by Adams and Balboa.

**COUNT III**
**Breach of Contract – Forsaken Agreement**
**(Further Alternative to Count I)**

109.    Peter repeats and realleges each of the preceding paragraphs as if fully set forth herein.

110.    In the alternative to Counts I and II, and in the event the Court determines that the Transfer Agreement is a valid and enforceable contract, Peter alleges that Adams and Balboa materially breached it as follows.

111.    If the ██████ recited in Section 2(b) of the Transfer Agreement is deemed to be a payment obligation owed to Peter, Adams and Balboa breached that obligation by

56

failing to deliver funds to Peter. Adams and Balboa further breached Section 2(c) by interfering with Peter's ability to receive and access the ██████████ to which he was entitled under Section 2(c), including by causing or contributing to the blocking of Peter's access to those funds through Roblox and DevEx.

112. Adams and Balboa also breached the implied covenant of good faith and fair dealing by communicating with Roblox in a manner that impaired Peter's ability to access the revenue to which he was entitled.

113. Peter performed his obligations under the Transfer Agreement, or his performance was excused by Adams and Balboa's prior material breach.

114. Adams and Balboa's failure to pay the ████████ recited in Section 2(b) is a material breach going to the essence of the Transfer Agreement. By reason of that material breach, Peter is entitled to rescission of the Transfer Agreement and restoration of the parties to their pre-agreement positions, including return of all rights in and control over *Forsaken*.

115. In the alternative to rescission, Peter is entitled to damages arising from Adams and Balboa's failure to pay the ███████ recited in Section 2(b) of the Transfer Agreement, and any amounts recited in Section 2(c) of the Transfer Agreement that Peter did not receive, including the loss of use of those funds. In addition, and whether or not the Transfer Agreement is rescinded, Peter is entitled to damages arising from Adams and Balboa's interference with Peter's ability to access the revenue to which he was entitled and their breach of the implied covenant of good faith and fair dealing, including the losses arising from the DevEx interference, which left revenue credited to Peter locked in Robux

57

and unusable for approximately ten months until after Peter's counsel sent a demand letter in March 2026, in an amount to be proven at trial.

## COUNT IV
### Breach of Bailment – Forsaken Discord Servers

116.   Peter repeats and realleges each of the preceding paragraphs as if fully set forth herein.

117.   The Forsaken Discord Servers is a valuable digital property over which Peter exercised sole ownership and control prior to May 26, 2025. On May 26, 2025, Peter delivered control of the Forsaken Discord Servers to Adams for the specific and limited purpose of temporarily managing it while Peter addressed the public crisis, with an express agreement that Adams would return control to Peter. Adams accepted control of the Server on those terms.

118.   Adams and Balboa breached the obligations of the bailment. Acting in concert, Adams and Balboa permanently converted the Server to their own use. Peter demanded return of the Server, and Adams and Balboa refused. Adams and Balboa have continued to wrongfully withhold the Server from Peter.

119.   As a direct and proximate result of Adams and Balboa's breach of the bailment, Peter has suffered damages, including the loss of the Forsaken Discord Servers and severance from his development team and player community, in amounts to be determined at trial.

## COUNT V
### Promissory Estoppel – Forsaken Discord Servers
### (Alternative to Count IV)

120.   Peter repeats and realleges each of the preceding paragraphs as if fully set forth herein.

121.   In the alternative to Count IV, and in the event the Court determines that no bailment was created or that the Forsaken Discord Servers does not constitute property subject to bailment, Peter alleges as follows.

122.   On May 26, 2025, Adams made a clear and definite promise to Peter, in writing, that the transfer of control over the Forsaken Discord Servers would be temporary and that Adams would return control to Peter.

123.   Adams made that promise with the intent to induce Peter to transfer control of the Server, and Peter reasonably relied on it in doing so. Peter's reliance was foreseeable — Adams solicited the transfer and knew Peter would not have relinquished control absent the promise of return.

124.   Peter was damaged by his reliance, including by the permanent loss of the Server, severance from his development team and player community, and deprivation of his ability to manage, operate, and sell *Forsaken*.

125.   Enforcement of Adams' promise is necessary to prevent injustice. Adams induced Peter to surrender a valuable digital property through a promise Adams never intended to honor, and has retained the benefit of that surrender while leaving Peter without recourse.

## COUNT VI
## Copyright Infringement

126.    Peter repeats and realleges each of the preceding paragraphs as if fully set forth herein.

127.    This count is asserted in the event the Court determines that the Transfer Agreement is void, invalid, unenforceable, or rescinded. If the Transfer Agreement is void or rescinded, no rights in *Forsaken* were ever validly conveyed to Adams and Balboa, and their continued exploitation of *Forsaken* constitutes copyright infringement.

128.    Peter is the author and owner of the original works of authorship embodied in *Forsaken*, including its source code, character designs, artwork, and other creative elements. Peter has registered those works with the United States Copyright Office: *Forsaken* (Video Game), Registration No. PA-2-582-508, effective May 6, 2026, and *Forsaken* – Source Code, Registration No. TXu 2-540-881, effective May 5, 2026.

129.    Without authorization, Adams and Balboa have reproduced, distributed, publicly displayed, and created derivative works from Peter's copyrighted works by continuing to publish, operate, and update *Forsaken* and by releasing new content derived from those works.

130.    As a direct and proximate result of Adams and Balboa's infringement, Peter has suffered actual damages and Adams and Balboa have realized profits attributable to the infringement, in amounts to be determined at trial. Peter is entitled to recovery of his actual damages and disgorgement of Adams and Balboa's profits pursuant to 17 U.S.C. § 504(b). Adams and Balboa's infringement has been continuing and ongoing, including through the

release of new versions and updated content derived from Peter's copyrighted works after the effective date of Peter's copyright registrations. With respect to acts of infringement occurring on or after the effective dates of Peter's registrations, Peter is entitled to statutory damages and attorneys' fees pursuant to 17 U.S.C. §§ 504(c) and 505

## COUNT VII
## Trademark Infringement and False Designation of Origin

131.    Peter repeats and realleges each of the preceding paragraphs as if fully set forth herein.

132.    This count is asserted in the event the Court determines that the Transfer Agreement is void, invalid, unenforceable, or rescinded. If the Transfer Agreement is void or rescinded, no rights in the FORSAKEN mark or associated brand assets were ever validly conveyed to Adams and Balboa, and their continued use of the mark constitutes trademark infringement and false designation of origin under 15 U.S.C. § 1125(a).

133.    Peter is the owner of the FORSAKEN mark, which he has used in commerce since December 25, 2024, predating any use by Adams and Balboa. The FORSAKEN mark is distinctive and has become associated with Peter as the source and owner of the *Forsaken* gaming experience.

134.    Without authorization, Adams and Balboa have used and continue to use the FORSAKEN mark in commerce in connection with the operation, promotion, and exploitation of *Forsaken*. Adams and Balboa's unauthorized use of the FORSAKEN mark falsely designates them as the source, owner, and sponsor of *Forsaken*, in violation of 15 U.S.C. § 1125(a).

61

135.   On information and belief, Adams and Balboa have applied or are applying to register the FORSAKEN mark with the United States Patent and Trademark Office based on that unauthorized use. Any such use cannot form the basis of a valid trademark registration superior to Peter's prior rights. Adams and Balboa's use of FORSAKEN is likely to cause confusion.

136.   As a direct and proximate result of Adams and Balboa's infringement, Peter has suffered actual damages and Adams and Balboa have realized profits attributable to their unauthorized use of the FORSAKEN mark, in amounts to be determined at trial. Peter is entitled to recovery of his actual damages, disgorgement of Adams and Balboa's profits, and injunctive relief enjoining Adams and Balboa from further use of the FORSAKEN mark and from prosecuting any pending trademark applications, pursuant to 15 U.S.C. §§ 1116 and 1117.

## COUNT VIII
### Fraud

137.   Peter repeats and realleges each of the preceding paragraphs as if fully set forth herein.

138.   On May 26, 2025, Adams represented to Peter in written Discord messages that Peter's transfer of control over the Forsaken Discord Servers would be temporary and that Adams would return control of the Server to Peter. That representation concerned a material fact.

139.   Adams made the representation with no present intention of performing it. Within minutes of receiving control of the Server, Adams permanently banned Peter from

it and publicly announced that he and Balboa were *Forsaken*'s owners, and Balboa later publicly admitted that they withheld the Server to prevent Peter from selling *Forsaken*.

140. Adams made the representation with the intent to induce Peter to surrender control of the Forsaken Discord Servers, and Peter justifiably relied on the representation in transferring control of the Server.

141. Adams and Balboa then used their wrongfully obtained control of the Forsaken Discord Servers to coerce Peter into executing the Transfer Agreement and surrendering *Forsaken*.

142. As a direct and proximate result of the fraud, Peter has suffered damages, including the loss of the Forsaken Discord Servers, the loss of *Forsaken* and its associated assets and revenues, and severance from his development team and player community, in amounts to be determined at trial. Peter is further entitled to punitive damages because Adams and Balboa's conduct was willful, malicious, and in deliberate disregard of Peter's rights.

**COUNT IX**
**Conversion – Forsaken Discord Servers**
**(Alternative to Count IV or V)**

143. Peter repeats and realleges each of the preceding paragraphs as if fully set forth herein.

144. In the alternative to Counts IV and V, Peter alleges that Adams and Balboa converted the Forsaken Discord Servers.

145. Peter owned and had the right to possess and control the Forsaken Discord Servers. Acting in concert, Adams and Balboa wrongfully exercised dominion and control

63

over the Server by permanently seizing it, banning Peter from it, and refusing to return it, in derogation of and inconsistent with Peter's rights.

146.    As a direct and proximate result of Adams and Balboa's conversion, Peter has suffered damages, including the loss of the Forsaken Discord Servers and severance from his development team and player community, in amounts to be determined at trial.

## COUNT X
## Conversion – Forsaken Roblox Group and Operational Control

147.    Peter repeats and realleges each of the preceding paragraphs as if fully set forth herein.

148.    This count is asserted in the event the Court determines that the Transfer Agreement is void, invalid, unenforceable, or rescinded. If the Transfer Agreement is void or rescinded, Peter retained ownership and the right to control the Forsaken Roblox Group, the Group Owner account, and the associated accounts through which *Forsaken* is operated.

149.    Peter owned and had the right to possess and control the Forsaken Roblox Group, the Group Owner account, and the associated operating accounts. Acting in concert, Adams and Balboa have wrongfully exercised dominion and control over those accounts by seizing and retaining control of them, operating *Forsaken* through them, and directing and collecting the revenues credited to them, in derogation of and inconsistent with Peter's rights.

150.    As a direct and proximate result of Adams and Balboa's conversion, Peter has suffered damages, including the loss of control over the Forsaken Roblox Group and

associated accounts and the revenues credited to and collected through them, in amounts to be determined at trial.

## COUNT XI
### Conversion – Spectre Account

151.   Peter repeats and realleges each of the preceding paragraphs as if fully set forth herein.

152.   This count is asserted in the event the Court determines that the Transfer Agreement is void, invalid, unenforceable, or rescinded. If the Transfer Agreement is void or rescinded, Peter retained ownership and the right to control the Spectre Account and the funds held in and credited to it.

153.   Peter owned and had the right to possess and control the Spectre Account and the funds it contained, including the ▮▮▮▮ recited in Section 2(b) of the Transfer Agreement that had been transferred into the account, other funds that originated from Peter's assets, and Peter's ▮▮▮▮▮▮▮ subsequently credited to the account in Robux. Peter surrendered control of the Spectre Account to Adams and Balboa in connection with the purported transfer of *Forsaken*. Acting in concert, Adams and Balboa have since exercised exclusive dominion and control over the Spectre Account and its funds, in derogation of and inconsistent with Peter's rights, and Peter has never received the funds held in or credited to the account.

154.   As a direct and proximate result of Adams and Balboa's conversion, Peter has suffered damages, including the loss of the Spectre Account and all funds held in and credited to it, in amounts to be determined at trial.

## COUNT XII
### Tortious Interference With Prospective Economic Advantage

155.    Peter repeats and realleges each of the preceding paragraphs as if fully set forth herein.

156.    Peter had reasonable expectations of economic advantage in (a) prospective transactions to sell or transfer *Forsaken* to third parties identified through Ethan Forbes, and (b) his ongoing relationships with the *Forsaken* development, support, and community teams. Adams and Balboa knew of these expectations and relationships.

157.    Adams and Balboa intentionally and improperly interfered with both, as set forth above. Their interference was accomplished through independently wrongful conduct, including their fraudulent seizure of the Forsaken Discord Servers, their false and defamatory statements about Peter, and their directing of the *Forsaken* development, support, and community teams to cease working on *Forsaken* or with Peter.

158.    In the absence of Adams and Balboa's interference, it is reasonably probable that Peter would have realized the economic advantage of the prospective transactions and preserved his business relationships.

159.    As a direct and proximate result of Adams and Balboa's interference, Peter has suffered damages, including the loss of prospective transactions to sell or transfer *Forsaken* and the loss of his business relationships, in amounts to be determined at trial. Peter is further entitled to punitive damages because Adams and Balboa's conduct was willful, malicious, and in deliberate disregard of Peter's rights.

## COUNT XIII
### Defamation

160.   Peter repeats and realleges each of the preceding paragraphs as if fully set forth herein.

161.   Counterclaim Defendants published false and defamatory statements of fact concerning Peter to third parties.

162.   Balboa's May 28, 2025 public statements imputing that Peter took, stole, or misappropriated funds belonging to others were false and defamatory. The statements were false because the funds belonged to Peter, as alleged above.

163.   Adams' May 26, 2025 public statements asserting that ownership and control of *Forsaken* had transferred to Adams and Balboa were false and defamatory. The statements were false because no transfer of ownership had occurred and Adams and Balboa held no ownership interest in *Forsaken* at the time the statements were made, as alleged above.

164.   The statements imputing theft and misappropriation to Peter constitute defamation per se, and damages are presumed.

165.   Counterclaim Defendants published each statement to third parties, including the members of the Forsaken Discord Servers and the public, without privilege or authorization.

166.   Counterclaim Defendants made each statement knowing it was false or with reckless disregard for its truth or falsity. To the extent Peter is determined to be a private figure, Counterclaim Defendants made each statement negligently as to its truth or falsity.

To the extent Peter is determined to be a public figure or the statements are determined to involve a matter of public concern, Counterclaim Defendants made each statement with actual malice.

167. As a direct and proximate result of Counterclaim Defendants' defamatory statements, Peter has suffered damages, including harm to his reputation, humiliation, and emotional distress, in an amount to be proven at trial.

## COUNT XIV
### Intentional Infliction of Emotional Distress

168. Peter repeats and realleges each of the preceding paragraphs as if fully set forth herein.

169. Counterclaim Defendants' conduct was extreme and outrageous, exceeding all possible bounds of decency and intolerable in a civilized community. Counterclaim Defendants exploited a psychological crisis they knew Peter to be suffering, amplified a false and misleading public narrative concerning Peter that they knew to be decontextualized, and orchestrated a campaign to strip Peter of ownership and control over *Forsaken* and its related accounts and services, all as alleged above.

170. Counterclaim Defendants engaged in this conduct intentionally or with reckless disregard for the severe emotional distress it would cause Peter.

171. Counterclaim Defendants' conduct caused Peter severe emotional distress.

172. As a direct and proximate result of Counterclaim Defendants' conduct, Peter has suffered severe emotional distress, including severe anxiety, depression, and panic attacks for which he sought mental health treatment, in an amount to be proven at trial.

## COUNT XV
## Unjust Enrichment

173. Peter repeats and realleges each of the preceding paragraphs as if fully set forth herein.

174. This count is asserted in the event the Court determines that the Transfer Agreement is void, invalid, unenforceable, or rescinded.

175. If the Transfer Agreement is void, invalid, unenforceable, or rescinded, Adams and Balboa have no legal basis to retain the revenues and benefits they have obtained from *Forsaken*.

176. Adams and Balboa have been knowingly enriched at Peter's expense, having collected and retained the revenues generated by *Forsaken* and the benefits of control over the Forsaken Property, all as alleged above.

177. Under the circumstances alleged above, including Adams and Balboa's wrongful seizure of the Forsaken Property and procurement of the Transfer Agreement, it would be unjust to permit Adams and Balboa to retain those revenues and benefits.

178. As a direct and proximate result, Peter is entitled to restitution of the revenues and benefits Adams and Balboa have unjustly obtained and retained, in an amount to be proven at trial.

## COUNT XVI
## Constructive Trust

179. Peter repeats and realleges each of the preceding paragraphs as if fully set forth herein.

180. This count is asserted in the event the Court determines that the Transfer Agreement is void, invalid, unenforceable, or rescinded.

181. Adams and Balboa hold the Forsaken Property and the revenues and proceeds derived therefrom under circumstances in which, in equity and good conscience, those assets and revenues belong to Peter.

182. Adams and Balboa obtained and continue to hold the Forsaken Property and the revenues derived therefrom through fraud, coercion, and other wrongful conduct, as alleged above.

183. Peter is entitled to the imposition of a constructive trust over the Forsaken Property and all revenues and proceeds derived therefrom that Adams and Balboa have obtained and retained, for the benefit of Peter, and an order directing Adams and Balboa to convey those assets and revenues to Peter.

## COUNT XVII
### Accounting

184. Peter repeats and realleges each of the preceding paragraphs as if fully set forth herein.

185. Adams and Balboa have exercised exclusive control over all *Forsaken* revenues since assuming control of the Forsaken Property, including Robux generated by the Experience, conversions through DevEx, distributions to third-party contributors, and revenues from associated products. The flows among these accounts and recipients are complex, and Peter lacks access to the records necessary to determine the amounts

70

collected, distributed, and retained. The amounts owed to Peter cannot be determined without an accounting.

186.    Peter is entitled to a full and complete accounting of all revenues, proceeds, and other benefits derived from the Forsaken Property and all accounts associated therewith, from the date Adams and Balboa assumed control to the present.

## COUNT XVIII
## Aiding and Abetting

187.    Peter repeats and realleges each of the preceding paragraphs as if fully set forth herein.

188.    As described above, Adams defrauded Peter.

189.    Balboa knowingly participated in and substantially assisted Adams's fraudulent scheme, including by demanding two-factor-authentication access to facilitate the transfer, accepting administrative control of the Forsaken Discord Servers obtained through the misrepresentation, and using that control as collective leverage against Peter.

190.    Upon information and belief, at all relevant times, Balboa was the agent, coconspirators, partners, and/or joint venturer of Adams, and in doing the things alleged herein, were acting at least in part within the course and scope of said agency, conspiracy, partnership, and/or joint venture and with the permission and consent of the other.

191.    Balboa and Adams acted in concert with one another to commit the wrongful acts alleged herein, and/or attempted to do so.

192.    Balboa aided, abetted, incited, compelled and/or coerced one another in the wrongful acts alleged herein, and/or attempted to do so.

193.    Balboa agreed to and executed a conspiracy or common plan pursuant to which they would commit the unlawful acts alleged herein, with all such acts alleged herein done as part of and pursuant to said conspiracy, intended to cause and actually causing Peter harm.

## PRAYER FOR RELIEF

WHEREFORE, Defendant and Counterclaim Plaintiff Peter Innes requests that the Court enter judgment as follows:

Peter pleads his counterclaims in the alternative to the fullest extent permitted by Rule 8(d). Certain counterclaims seek inconsistent or alternative remedies, including rescission and restitution on the one hand and damages on the other. Peter does not seek duplicative recovery for the same injury under multiple counts, and the Court should award relief consistent with the theory or theories on which Peter prevails.

A.      A declaration that the Transfer Agreement is void, unenforceable, and of no legal effect, and that Peter retains all rights in and to *Forsaken* and the Forsaken Property;

B.      Rescission of the Transfer Agreement and restoration of the parties to their pre-agreement positions, including return of all rights in and control over *Forsaken* and the Forsaken Property;

C.      Restitution of all revenues, proceeds, and other benefits Adams and Balboa have unjustly obtained and retained from the Forsaken Property;

D.      Imposition of a constructive trust over the Forsaken Property and all revenues and proceeds derived therefrom, and an order directing Adams and Balboa to convey those assets and revenues to Peter;

72

E.      A full and complete accounting of all revenues, proceeds, and other benefits derived from the Forsaken Property and all accounts associated therewith;

F.      Compensatory damages in an amount to be proven at trial;

G.      Disgorgement of all profits Adams and Balboa have derived from their wrongful conduct;

H.      Punitive damages to the extent permitted by law[2];

I.      Injunctive relief restraining Adams and Balboa from continuing to use, operate, exploit, or derive revenue from the Forsaken Property pending resolution of this action, and permanently upon entry of judgment in Peter's favor;

J.      An award of Peter's costs and attorneys' fees to the extent permitted by law;

K.      Pre- and post-judgment interest to the extent permitted by law;

L.      Such other and further relief as the Court deems just and proper.

### JURY DEMAND

Counterclaim Plaintiff demands a trial by jury on all issues so triable.

---

[2] Peter's punitive damages request is made pursuant to Minn. Stat. § 549.20. In accordance with the practice of this District, Peter pleads punitive damages directly rather than by motion under Minn. Stat. § 549.191. *See, e.g.*, *Truong v. Ne. Title* Loans, LLC, No. 23-CV-2512 (NEB/TNL), 2024 WL 7009928, at *2 (D. Minn. Feb. 13, 2024).

Dated: July 6, 2026

**SAUL EWING LLP**

*/s/ Erin Westbrook*
Erin Westbrook (MN #0393072)
90 South Seventh Street, Suite 3900
Minneapolis, MN 55402
612-225-2946
erin.westbrook@saul.com

and

Jonathan B. Loiterman (*pro hac vice admission pending)*
Stephen A. Cazares (*pro hac vice)*
Foundation Law Group, LLP
4100 Alameda Avenue, 3rd Floor
Burbank, California 91505
(541) 930-2688
jon.loiterman@foundationlaw.com
scazares@foundationlaw.com

*Attorneys for Defendant and Counterclaim Plaintiff Peter Innes*

74