**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Eli Adams, an individual, and Reyna Balboa, an individual,<br><br>Plaintiffs and Counterclaim Defendants,<br><br>v.<br><br>Peter Innes, an individual,<br><br>Defendant and Counterclaim Plaintiff,<br><br>and<br><br>EHA Consulting, LLC, a Louisiana limited liability company,<br><br>Additional Counterclaim Defendant. | Court File No. 0:26-cv-02415 (JMB/SGE)<br><br>**DEFENDANT AND COUNTERCLAIM PLAINTIFF PETER INNES' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL DISMISSAL OF COUNTERCLAIMS** |

## INTRODUCTION

Counterclaim Plaintiff Peter Innes ("Peter") was seventeen years old when he created *Forsaken*, a video game on the Roblox platform. *Forsaken* was a rousing success: it has been played by tens of millions of gamers worldwide and has generated millions of dollars in revenue.

In May 2025, Counterclaim Defendant Eli Adams ("Adams"), sensing an opportunity to exploit the false public accusation that Peter had distributed child sexual exploitation material, fraudulently promised Peter he would take temporary control over the Forsaken Discord servers, ostensibly to manage them while Peter dealt with the crisis.

The Discord servers were the principal means of communication for the Forsaken gaming community. Control the servers, control Forsaken. Within the hour, Adams reneged on the promise and banned Peter from the Discord servers. Adams and his partner, Counterclaim Defendant Reyna Balboa ("Balboa"), then leveraged their control of the Discord servers to coerce Peter to sign an instrument purporting to transfer *Forsaken* to them.

Adams and Balboa now ask the Court to dismiss, in whole or in part, eight of Peter's twenty-one counterclaims against them. (Mot. for Partial Dismissal, Dkt. 36; Mem. in Supp., Dkt. 37 ("Mem.").) They argue the fraud claims fail against Adams because Peter "does not allege facts demonstrating reliance." (Mem. at 6.) This argument fails. Peter specifically alleges that "Adams promised Peter that he would return control, and Peter transferred control over the Forsaken Discord Servers in *reliance* on that promise." (Am. Countercl., Dkt. 34 ¶ 58 (emphasis added).) Peter further alleges that the control over the servers obtained as a result of the false promise is what coerced him to later sign the instrument. As for Balboa, they argue that fraud fails because she made no representation herself. But Peter's claims allege Balboa's participation, consistent with authority cited by Adams and Balboa.

Adams and Balboa assert Peter's defamation claim fails because Adams' announcement that ownership of *Forsaken* "has been transferred" was a "dry recitation of facts." It was neither a fact nor dry. It was, in fact, a false statement because no transfer of *Forsaken* had occurred. And it was not "dry" because the falsely claimed "transfer" was attributed as the consequence of the false accusations against Peter, lending those

accusations the weight of an insider's confirmation. Accordingly, Peter adequately alleges defamation.

Adams and Balboa are "not challenging," for purposes of this motion, whether a Discord server is "property" Peter owned, nor do they move to dismiss his claim that taking the servers was civil theft. Yet they insist that Peter's loss of those servers can support neither a bailment nor a conversion claim. They are wrong on both. They argue a Discord server is not a "good," but acknowledge that term "has never been expressly defined" and cite no case holding that intangible property cannot be bailed. They assert that conversion fails because intangible assets are not "property" that can be converted. But the only case they cite involved money moved by wire transfer, and it declined to decide whether money in that form can be converted and turned on the defendant's lack of intent.

Lastly, they argue an accounting is a remedy, not a claim. But Peter prays for that remedy independently, and the counterclaims plead the complex, exclusively controlled revenue flows that warrant it. None of these arguments warrants dismissal, and the motion should be denied. If the Court finds any claim lacking, the dismissal should be without prejudice and with leave to file an amended pleading within thirty days.

## FACTUAL BACKGROUND

The facts below are drawn from the First Amended Counterclaims and are taken as true for purposes of this motion.

### A. Peter Builds *Forsaken* and Its Discord Community.

Peter conceived, developed, and created *Forsaken*, a Roblox experience (Roblox's term for a game on its platform), between August 2024 and December 25, 2024, when he published it on the Roblox platform. (Am. Countercl. ¶¶ 36, 38.) He was seventeen years old. (*Id.* ¶¶ 1, 35.) *Forsaken* has attracted more than 84 million players and generated millions of dollars in revenue, and it was Peter's primary source of income. (*Id.* ¶¶ 41–42.)

Peter also built four servers for *Forsaken* on Discord, an online platform where communities gather in "servers" to communicate. They grew into a community of more than one million members and became the central hub through which he managed both the game's player community and its development team. (*Id.* ¶¶ 3, 30, 43.) Peter was the sole owner of the servers and of all other *Forsaken* property. (*Id.* ¶¶ 37, 44, 54.)

Each Discord server is designated at creation by a unique and permanent numeric identifier. Discord vests server owner status in one account at a time; that account alone can admit and ban members, assign and revoke roles, and transfer ownership; and Discord keeps records of each server's owner and of every transfer of that status. (*Id.* ¶ 30.)

A Roblox Group, through which a Roblox experience and its revenue are controlled, works the same way. It is controlled by a single Group Owner account, identified by a unique and permanent identifier, and whoever holds that account's credentials "possesses and controls the account and the Group to the exclusion of all others." (*Id.* ¶ 27.) The same is true of each Roblox account through which *Forsaken* is

operated, including the account that holds Group Owner status and the Spectre Account (the Roblox account that, as of May 2025, controlled the *Forsaken* Roblox Group): each is identified by a unique and permanent identifier, accessed through credentials and two-factor authentication held to the exclusion of all others, and transferable for value. (*Id.* ¶¶ 27, 32, 67.) Discord servers and Roblox Group Owner status are bought and sold and have ascertainable market value. (*Id.* ¶¶ 29–30, 32.)

Robux, a virtual token issued by Roblox, is not legal tender, cannot leave the Roblox platform, and can be converted to U.S. dollars only through Roblox's Developer Exchange program ("DevEx"), with Roblox's approval. (*Id.* ¶ 29.) Roblox records the Robux balance of each account and the amount, date, and source of every credit and debit to it. (*Id.*)

**B. The YouTube Video.**

Peter turned eighteen in March 2025. (*Id.* ¶ 35.) On or about May 20, 2025, a YouTube video falsely accused him of distributing child sexual exploitation material and repeatedly demanded that he disassociate from *Forsaken* and its Discord servers. (*Id.* ¶¶ 4, 46–47.) In reality, Peter was himself a victim of sexual abuse and exploitation as a child. (*Id.* ¶ 4.) The video and related content spread virally and reached millions of people. Peter received numerous death threats, was subjected to coordinated online harassment campaigns, and has endured sustained abuse, much of it from *Forsaken*'s own fans, that continues to this day. (*Id.* ¶¶ 5, 48, 50.) Adams and Balboa knew the true context of the events the video described. (*Id.* ¶ 49.)

### C. Adams Obtains the Servers on a Written Promise and Bans Peter Within the Hour.

Adams and Balboa were members of the *Forsaken* Discord community and players of the game, and Peter knew and trusted them. (*Id.* ¶ 45.) In the wake of the video, Adams reached out to Peter's girlfriend, Ava Wesley, to ask about stepping in to manage the *Forsaken* Discord servers. (*Id.* ¶¶ 6, 57.) Following up on that inquiry, Peter contacted Adams through Discord on May 26, 2025, and asked whether he could "temporarily give u ownership of the discord servers & stuff." (*Id.* ¶¶ 57–58, 154.) Adams replied that he would "be down to cover everything if you guys need / Just for a while / While you guys get things sorted." (*Id.* ¶ 58.) Peter twice asked for a promise: "just please promise me that it wont be permanent." (*Id.*) Adams answered at 3:46 p.m.: "It won't be / . . . / You have my word soul." (*Id.*)[1] A minute later, at 3:47 p.m., Peter wrote, "ill go transfer ownership of stuff over to you now," and he transferred control of the servers in reliance on Adams' promise that it would be temporary. (*Id.* ¶¶ 58, 156.) Adams accepted control of the servers on those terms: for the limited purpose of managing them temporarily while Peter addressed the crisis, with an express agreement that he would return control to Peter. (*Id.* ¶¶ 58, 133.)

Adams then asked whether Balboa could help him, "[a]lmost like a temp co-owner." (*Id.* ¶ 59.) Peter agreed, adding, "i just really really really dont wanna. have this be a permenant thing," and Adams responded: "It isn't soul / I promise you this." (*Id.*)

[1] In the quoted Discord messages, Peter is "Soul," Adams is "Hytoko," and Balboa is "Basil"; Balboa uses the handle @Cowoika on X. (Am. Countercl. ¶¶ 15–17.)

Within minutes, Adams pressed, on Balboa's behalf, for access to the account that held the *Forsaken* Roblox Group and controlled its payouts. When Peter asked to "keep total ownership of the holder account for the group," Adams told him that Balboa "was mainly hoping for the code so she could more effectively do stuff when it comes to payouts," and he relayed "a question from Basil." When Peter asked "why would u need the / email," Adams explained that "[w]e're both really worried about there being any traces of you guys still owning the game right now." (*Id.* ¶¶ 27, 60–61.) Peter told Adams he did not want to "get left behind & abandoned." (*Id.* ¶ 61.) At 4:12 p.m., Adams reassured him: "I promise you we won't replace you . . . . [Y]ou can trust me soul." (*Id.*)

Just over fifteen minutes later, at 4:28 p.m., Adams permanently removed Peter from the servers and posted a message to the entire community announcing that "ownership of Forsaken has been transferred to myself, @Hytoko, and @Basil (@cowoika)." (*Id.* ¶ 62.) The announcement presented the change as a response to the controversy: "As many of you know things have been rocky. . . . Following recent things, and agreements within the team, ownership of Forsaken has been transferred . . . ." (*Id.*) No transfer of ownership had occurred; Adams and Balboa held no ownership interest in *Forsaken* when the announcement was made. (*Id.* ¶¶ 62, 189.) Adams posted the same message on other social media channels. (*Id.* ¶ 63.)

### D. Adams and Balboa Refuse to Return the Servers and Use Them as Leverage.

That evening, Adams and Balboa made clear they had no intention of returning the servers. (*Id.* ¶ 64.) Adams wrote: "The second the announcement came out / So much shit

cleared up. . . . / We cannot mess this up now." (*Id.* ¶ 65.) Another participant in the conversation added that "this thing cant really be temporary / we already made the announcement / cant go takesie backsie," and Balboa agreed: "people are seeing this as a permanent change." (*Id.*) When Peter asked for time, Adams responded, "You can have time, but Basil and I need the information . . . to the specter account," and Balboa followed: "i have it but / i need 2fa access." (*Id.* ¶¶ 67, 115.)

The next day, Peter told Adams and Balboa about the harassment he and his family were enduring as a result of the YouTube video and the announcement: they had been "receiving non-stop phone calls, hate mail, threats, and unpaid pizza deliveries." (*Id.* ¶ 68.) That same day, Peter's girlfriend demanded the servers back: "we just want the discord back." (*Id.* ¶ 69.) Adams refused. He claimed that the transfer was "permannet [sic]" under Discord's terms of service, that he did not want to return the servers, and that he could not because he had already transferred the servers to Balboa. (*Id.*) Discord imposes no such limit, as Adams' own transfer to Balboa showed. (*Id.* ¶ 70.)

Early on May 28, in a post on X that received more than 34,000 impressions, Balboa wrote that "[w]e got news" of Peter "wanting to sell the game" and that "the general consensus was we were still going to withhold the server to try and attempt to stop any sort of transaction from going through." (*Id.* ¶ 74.) Later that day, Adams wrote: "it was supposed to only be temp ownership but once all us leads realized how fucked that would be we tried discussing it as permannet [sic]." (*Id.* ¶ 73.)

For the month that followed, Peter remained locked out of his own community. (*Id.* ¶ 83.) Adams and Balboa used the servers to exercise operational control over

*Forsaken* and directed the development and support team to stop working on the game and supporting the community. (*Id.*) As long as they held the servers and directed the team's activities, Peter could not operate or manage *Forsaken*, sell or transfer the experience to anyone else, or organize his team for a new project. (*Id.* ¶ 84.) Adams and Balboa used that control to corner Peter into surrendering *Forsaken* on their terms. (*Id.* ¶¶ 72, 86, 157.)

### E. The Transfer Agreement.

Newly eighteen, isolated from his team and players, and without counsel of his own, Peter signed an instrument dated June 29, 2025 (the "Transfer Agreement") after midnight. (*Id.* ¶¶ 10, 81, 86, 89.)

### F. After the Signing.

Peter then transferred control of the *Forsaken* Roblox Group and gave Adams and Balboa the credentials to its associated accounts, including the Spectre Account. (*Id.* ¶ 99.) Peter had transferred the purchase price recited in the Transfer Agreement into the Spectre Account himself, from property he already owned. (*Id.* ¶¶ 100–01.) Adams and Balboa then changed the Spectre Account's credentials so that Peter could no longer access it, and they have excluded him from the account and its Robux balance (the "Spectre Robux Balance") ever since. (*Id.*) Since its deposit, the Spectre Robux Balance has been held in a single identified account, never commingled with any other, with every credit and debit recorded by Roblox. (*Id.* ¶ 101.) Peter has never received anything under the Transfer Agreement that was not already his. (*Id.* ¶¶ 90–91, 101, 103.)

Adams and Balboa have operated *Forsaken* and exercised exclusive control over its revenues ever since, including Robux, DevEx conversions, and distributions to outside contributors, flows that are complex and whose records Peter cannot access. (*Id.* ¶¶ 99, 104, 211.) They have never returned the Discord servers. (*Id.* ¶¶ 134, 226.)

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Warmington v. Bd. of Regents of Univ. of Minn.*, 998 F.3d 789, 795 (8th Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (cleaned up). Where there are "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 796 (quoting *Iqbal*, 556 U.S. at 679). The pleading "should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible," and "inferences are to be drawn in favor of the non-moving party." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594–95 (8th Cir. 2009).

Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud," but "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Particularity means pleading "such matters as the time, place, and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Drobnak v. Andersen Corp.*, 561 F.3d 778, 783 (8th Cir. 2009) (quoting

*Schaller Tel. Co. v. Golden Sky Sys., Inc.*, 298 F.3d 736, 746 (8th Cir. 2002)). In short, the pleading must identify "the 'who, what, where, when, and how' of the alleged fraud." *Id.* (quoting *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006)). "Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." *Streambend Props. II, LLC v. Ivy Tower Minneapolis, LLC*, 781 F.3d 1003, 1013 (8th Cir. 2015).

Both sides apply Minnesota law. (*See* Mem. at 4 & n.1.)

## ARGUMENT

### I. THE FRAUD COUNTERCLAIM (COUNT VIII) AND THE FRAUD GROUND FOR RESCISSION (COUNT II(A)) ARE ADEQUATELY PLEADED.

Adams and Balboa treat Count VIII and the fraud ground of Count II as "the same theory of fraud" and attack them together. (Mem. at 4.) They are different claims seeking different relief. Count VIII is a tort claim for damages caused by the fraud by which Adams obtained the servers on May 26, 2025. (Am. Countercl. ¶¶ 153–58.) Count II(A) is one of four independent grounds on which Peter seeks rescission of the June 29 instrument. (*Id.* ¶¶ 123–24.) Minnesota has long allowed a defrauded party to pursue both and elect later, *see Disbrow v. Creamery Package Mfg. Co.*, 104 Minn. 17, 23–24, 115 N.W. 751, 753 (1908), and the Federal Rules permit pleading them in the alternative, Fed. R. Civ. P. 8(d)(2)–(3). Both are adequately pleaded.

### A. Count VIII States a Claim for Fraud.

#### 1. The Counterclaims Plead the Misrepresentation with Particularity.

Adams and Balboa say Peter alleges "just a single misrepresentation." (Mem. at 5.) However, one misrepresentation is enough: the first element of fraud is "a false representation." *U.S. Bank N.A. v. Cold Spring Granite Co.*, 802 N.W.2d 363, 373 (Minn. 2011). And that misrepresentation is pleaded with the particularity Rule 9(b) requires. *Who*: Adams. *When*: May 26, 2025, with each message timestamped to the minute in the counterclaims (Am. Countercl. ¶¶ 58–59, 61). *Where and how*: in written Discord messages. *What*: in response to Peter's plea, "just please promise me that it wont be permanent," Adams wrote, "It won't be / . . . / You have my word soul," and, after the transfer, "It isn't soul / I promise you this," and "you can trust me soul." *What was obtained*: control of the servers, which Peter transferred one minute after the first promise. (Am. Countercl. ¶¶ 57–61, 154, 156; *see* Factual Background § C.)

Because the misrepresentation was a promise, the counterclaims also allege that Adams made it with no intention of keeping it (Am. Countercl. ¶ 155), which is what Minnesota law requires. *See Martens v. Minn. Mining & Mfg. Co.*, 616 N.W.2d 732, 747 (Minn. 2000). That allegation is far more than a threadbare recital of the elements: just over fifteen minutes after "you can trust me soul," Adams banned Peter from the servers and announced that ownership of *Forsaken* had been transferred (Am. Countercl. ¶ 62), and even before that, eleven minutes after the transfer, he was already pressing for the credentials to the account that held the Forsaken Roblox Group because "[w]e're both

really worried about there being any traces of you guys still owning the game right now" (*id.* ¶ 60). Peter has adequately pleaded misrepresentation with particularity.

### 2. Reliance Is Adequately Pleaded, and It Was Justified Under Adams and Balboa's Own Authority.

Adams and Balboa next argue that Peter "merely alleges reliance as a conclusory matter" and could not have relied on the promise when he signed the Transfer Agreement more than a month later. (Mem. at 6.) Both arguments address an act of reliance Count VIII does not allege. Peter relied on Adams' promise when he transferred control of the servers on May 26, and the counterclaims plead that reliance in detail: Peter asked for the promise, Adams gave it, and one minute later Peter wrote, "ill go transfer ownership of stuff over to you now," and did so "in reliance on that promise." (Am. Countercl. ¶¶ 58, 156.) That is reliance shown, not asserted.

The only case Adams and Balboa cite on reliance sets the standard, and the pleaded facts meet it. A listener "may rely on the representation so long as it is not known by the listener to be false and is not obviously false," and whether reliance was reasonable "is ordinarily a fact question for the jury." *Hoyt Props., Inc. v. Prod. Res. Grp., L.L.C.*, 736 N.W.2d 313, 321 (Minn. 2007). As pleaded, nothing was known or obvious to Peter when he transferred the servers a minute after Adams wrote "You have my word"; the signs of falsity came afterward, including the 4:28 p.m. ban and announcement (Am. Countercl. ¶ 62) and, that evening, Adams and Balboa's statements that they had no intention of returning the servers (*id.* ¶ 64). Peter had already relied on Adams' promise, and what he learned later does not undo that reliance.

The signing a month later is not the reliance Count VIII alleges; it is part of the harm. Having obtained control of the servers, Adams and Balboa used that control to corner Peter into surrendering *Forsaken* on their terms (Am. Countercl. ¶¶ 72, 83–86, 157), and Count VIII seeks the resulting losses (*id.* ¶ 158). Whether those losses are attributable to the fraud is a question for the factfinder. *See Davis v. Re-Trac Mfg. Corp.*, 276 Minn. 116, 119–20, 149 N.W.2d 37, 40 (1967) (jury "was free to find" that later losses were "attributable to the misrepresentation").

**3. Balboa's Participation Is Adequately Pleaded.**

Adams and Balboa argue that the fraud claim fails as to Balboa because the counterclaims allege "no representations by her." (Mem. at 5.) But their own authority asks only that the complaint "inform each defendant of the nature of his alleged participation in the fraud." *Streambend*, 781 F.3d at 1013. Under Minnesota law, one who knows of another's wrongful conduct and "substantially assist[s] or encourage[s]" it is liable for the resulting tort whether or not she made the representation herself. *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 187 (Minn. 1999). The counterclaims describe Balboa's part in detail. Within minutes of the transfer, Adams asked that she serve as a "temp co-owner" and pressed for the account "code" on her behalf. That evening, she agreed that "people are seeing this as a permanent change" and demanded "2fa access" to the Spectre Account. By the next morning, Adams had transferred the servers to Balboa. And on May 28 she announced publicly that "the general consensus was we were still going to withhold the server to try and attempt to stop any sort of transaction from going through." (Am. Countercl. ¶¶ 59–60, 65, 67, 69, 74, 115–16, 157.)

That is enough. Minnesota's rule reaches "all who actively participate in any manner in the commission of a tort, . . . or who ratify it after it is done," *Witzman*, 601 N.W.2d at 185–86 (quoting *Greenwood v. Evergreen Mines Co.*, 220 Minn. 296, 309, 19 N.W.2d 726, 733 (1945)), and Peter's injury from the fraud was not complete when the servers changed hands: it ran through the retention of the servers and the signing that followed. (Am. Countercl. ¶¶ 157–58.) In any event, Balboa's liability for Adams' fraud is independently pleaded in Count XVIII (aiding and abetting), which Adams and Balboa do not challenge, and under which she is jointly and severally liable. *See Witzman*, 601 N.W.2d at 185–86; Am. Countercl. ¶¶ 214–19.

### B. The Fraud Ground for Rescission Is Adequately Pleaded, and Count II Survives Regardless.

The fraud ground is adequately pleaded. Adams and Balboa argue that Peter could not have relied on the May 26 promise when he signed. (Mem. at 6.) But Count II(A) does not depend on reliance at signing. It pleads a single scheme: Adams obtained control of the servers by deception, and Adams and Balboa then "used their wrongfully obtained control of the Server to coerce Peter into executing the Transfer Agreement." (Am. Countercl. ¶ 123(A); *see id.* ¶ 157.) Minnesota law treats fraud carried out through compulsion as fraud. "[D]uress is a species of fraud in which compulsion in some form takes the place of deception in accomplishing the injury," and "[a] party who has been injured by duress is entitled to the same remedies which are available in cases of deceit," including rescission. *Neibuhr v. Gage*, 99 Minn. 149, 156–57, 108 N.W. 884, 887–88 (1906), *adhered to on reh'g*, 109 N.W. 1 (Minn. 1906); *accord Snyder v. Samuelson*, 140

Minn. 57, 58, 167 N.W. 287, 287 (1918) ("Duress is a species of fraud . . . ."). That rule concerns what remedies fraud supports. It does not ask the Court to decide anything about the separately pleaded duress ground, which Adams and Balboa do not challenge. (*See* Am. Countercl. ¶ 123(B).) Whether that scheme produced the signing is a question of fact, not a ground for dismissal on the pleadings.

And even if the fraud ground failed, Count II would not: the motion does not reach the three other independent grounds on which it seeks rescission (duress, unconscionability, and failure of consideration). (Am. Countercl. ¶ 123(B)–(D).)

## II. COUNT XIII STATES A CLAIM FOR DEFAMATION BASED ON ADAMS' ANNOUNCEMENT.

Adams and Balboa challenge only the part of Count XIII based on Adams' May 26 announcement (Am. Countercl. ¶ 189). They do not challenge the part based on Balboa's May 28 statements (*id.* ¶¶ 188, 190), so Count XIII proceeds regardless. As to the announcement, they argue that it was "simply a dry recitation of facts." (Mem. at 8.) It was neither.

It was not a recitation of fact; it was false and defamatory. When Adams announced that "ownership of *Forsaken* has been transferred," no transfer had occurred, and Adams and Balboa held no ownership interest in *Forsaken*. (Am. Countercl. ¶¶ 62, 189.) Their own Complaint confirms it: that evening, Balboa was still "urging Innes to reconsider his insistence that it be temporary," and Peter "asked for some time to think." (Compl., Dkt. 2 ¶¶ 14–15.) By their own account, the instrument purporting to transfer *Forsaken* was not signed until more than a month later. (Mem. at 2.)

Nor was it "dry." The authority cited by Adams and Balboa asks "whether a reasonable factfinder could conclude that the statements imply an assertion that is defamatory." (Mem. at 7 (quoting *Schlieman v. Gannett Minn. Broad., Inc.*, 637 N.W.2d 297, 308 (Minn. Ct. App. 2001) (cleaned up)).) That question cannot be answered by reading one sentence in isolation. Adams published the announcement to a community of more than a million members six days after a viral video falsely accused Peter of child exploitation and demanded that he disassociate from *Forsaken*. (Am. Countercl. ¶¶ 4, 43, 46–47, 62.) He framed the "transfer" as the consequence of that controversy: "As many of you know things have been rocky. . . . Following recent things, and agreements within the team, ownership of *Forsaken* has been transferred . . . ." (*Id.* ¶ 62.) A reasonable reader could understand the announcement to mean that Peter had been removed from his own game because of the accusations, lending them the weight of an insider's confirmation. That the announcement might also be read innocently changes nothing: Minnesota law recognizes a category of statements "reasonably susceptible to a defamatory meaning as well as an innocent one." *Schlieman*, 637 N.W.2d at 307 (citing *Church of Scientology v. Minn. State Med. Ass'n Found.*, 264 N.W.2d 152, 155 (Minn. 1978)).

Adams and Balboa saw at once how the community read the announcement: as Peter's permanent exit. That evening, Adams wrote that "[t]he second the announcement came out / So much shit cleared up," and Balboa agreed that "people are seeing this as a permanent change." (Am. Countercl. ¶ 65.) What cleared up for the game fell on Peter: the next day, he reported that, as a result of the video and the announcement, his family

was receiving "non-stop phone calls, hate mail, threats, and unpaid pizza deliveries." (*Id.* ¶ 68.) *McKee* held that a statement that a doctor left a hospital room without talking to the family, taken "in the light of surrounding circumstances," could not lower him in the community's estimation; *Yang* turned on the plaintiff's failure to plead "any fact" showing reputational harm. *McKee v. Laurion*, 825 N.W.2d 725, 732 (Minn. 2013) (quoting *Gadach v. Benton Cnty. Co-op. Ass'n*, 236 Minn. 507, 510, 53 N.W.2d 230, 232 (1952)); *Yang v. Robert Half Int'l, Inc.*, 79 F.4th 949, 963 (8th Cir. 2023). Here, a false statement of fact, published in the context of the accusations, is "reasonably capable of carrying a defamatory meaning" (Mem. at 7 (quoting *Schlieman*, 637 N.W.2d at 307)), and Peter pleads the harm that followed (Am. Countercl. ¶ 68). "If the words are capable of conveying a defamatory meaning, it is for the jury to decide whether they were in fact so understood." *McKee*, 825 N.W.2d at 732. As a result, the counterclaims adequately plead a false statement of fact reasonably capable of a defamatory meaning in context, together with the harm that followed; whether the community in fact so understood it is a question for the jury, not one the Court can resolve on the pleadings.

## III. COUNT IV STATES A CLAIM FOR BREACH OF BAILMENT.

Adams and Balboa argue that a bailment requires delivery of "goods" and that a Discord server is not a good because it is intangible. (Mem. at 8–9.) They acknowledge that "goods" "has never been expressly defined" in Minnesota bailment law (*id.* at 9), and they cite no case in which a bailment failed because the property delivered was intangible. Their definition comes from Article 2 of the Uniform Commercial Code,

which governs sales of goods, not bailments. (*Id.* (citing Minn. Stat. § 336.2-105(1)).) And the cases they cite involved "grain," "cars," and "other tangible and movable items" (*id.*); none had occasion to decide whether intangible property can be bailed.

Minnesota bailment law asks a different question. A bailment "is a relationship arising out of express or implied contract and is governed by contract principles." *Colwell v. Metro. Airports Comm'n*, 386 N.W.2d 246, 247 (Minn. Ct. App. 1986). Adams and Balboa quote the governing test but never apply it. The test asks about delivery, not tangibility: "whether there is a full transfer of the property, amounting to relinquishment of exclusive possession, control and dominion over the property for the duration of the relationship." *Id.* at 248; *see* Mem. at 8. Peter's transfer meets it. Discord vests owner status in one account at a time, and that account alone controls the server. (Am. Countercl. ¶ 30.) Peter transferred that status to Adams for the limited purpose of managing the servers temporarily, on Adams' express agreement to return it, and Adams accepted on those terms. (*Id.* ¶¶ 58, 133.) Discord's "owner" label describes control, not title: Peter delivered possession and control for a limited purpose and retained ownership. (*Id.* ¶¶ 133, 161, 223.) That is a full transfer of exclusive possession, control, and dominion. And because a bailment is "governed by contract principles," *Colwell*, 386 N.W.2d at 247, it is the parties' express terms, temporary custody and return, that define what was transferred, not the label the platform attaches to the custodian. The bailment in *Colwell* failed because "Colwell kept the keys." *Colwell*, 386 N.W.2d at 248. Peter handed over his: the owner status that alone controls a Discord server. A driver who hands over the only key to his car surrenders possession and control of it for as long as

the other person holds the key; no one would say he has surrendered ownership of the car. Adams and Balboa then refused to return the servers. (Am. Countercl. ¶¶ 69, 134.)

A decision from this District that considered a bailment of intangible property shows what was missing there and is present here. In *In re Target Corp. Data Security Breach Litigation*, the court assumed that "intangible property such as . . . personal financial information can constitute property subject to bailment principles," but held that the plaintiffs had not alleged that Target "agreed that Target would return the property to them," and that third parties had stolen the data, "not that Target wrongfully retained" it. 66 F. Supp. 3d 1154, 1177 (D. Minn. 2014). Peter pleads both: an express agreement to return (Am. Countercl. ¶¶ 58–61, 133) and wrongful retention by the bailee (*id.* ¶¶ 69, 134).

## IV. COUNTS IX, X, AND XI STATE CLAIMS FOR CONVERSION.

### A. The Only Question Is Whether Intangibility Bars Conversion.

For purposes of this motion, Adams and Balboa "are not challenging whether a Discord server is 'property' that Innes owned" (Mem. at 10 n.2). They argue only that Minnesota does not recognize conversion of intangible property. (*Id.* at 10.) Count IX (the Discord servers) does not depend on the validity of the Transfer Agreement. (Am. Countercl. ¶ 161.) Counts X (the Roblox Group and its accounts) and XI (the Spectre Account) are asserted in the event the Transfer Agreement is void or rescinded (*id.* ¶¶ 167, 174), as Rule 8(d)(2) permits; if the instrument is void or rescinded, the consent it recited never existed.

### B. *TCI* Does Not Hold That Intangible Property Cannot Be Converted.

Adams and Balboa's argument rests on a single case, *TCI Business Capital, Inc. v. Five Star American Die Casting, LLC*, 890 N.W.2d 423 (Minn. Ct. App. 2017), which they describe as holding that "intangible assets are not 'property' that can be converted." (Mem. at 10.) *TCI* holds no such thing. It concerned only money moved by wire transfer and recorded in accounting entries, and it said that the premise "that money in an intangible form is property . . . is without precedent in Minnesota law." 890 N.W.2d at 428. It then acknowledged that "the traditional common-law rule has been modified in some jurisdictions, where the concept of conversion has been expanded to allow claims based on intangible property interests, such as money in a bank account." *Id.* at 429. And it expressly declined to decide the question: "we need not resolve TCI's first contention, that the district court erred by ruling that Flynn did not interfere with TCI's property interests." *Id.* The court affirmed on intent alone, because Flynn "intended that TCI's funds would be returned to TCI, which is what occurred." *Id.* at 430. Here, Adams and Balboa refused to return the servers. (Am. Countercl. ¶¶ 69, 162–63.)

### C. A Minnesota Appellate Court Treats Registered Digital Assets as Property, and the Leading Authority Recognizes Their Conversion.

Where *TCI* left the question open, the Minnesota Court of Appeals has treated digital assets defined by a registry and controlled by a single holder as property. *Sprinkler Warehouse, Inc. v. Systematic Rain, Inc.*, 859 N.W.2d 527, 530–32 (Minn. Ct. App. 2015) (holding that a domain name, which is "unique and exclusionary" because "only one entity can register and use" it "at any given time," is property subject to

garnishment). In doing so, it observed that courts addressing the question "have either concluded that they are property, or have declined to dispute the characterization," and relied on *Kremen v. Cohen*, 337 F.3d 1024 (9th Cir. 2003), which "discusses this question thoroughly" and "held that a domain name is property for the purposes of protection from conversion." *Sprinkler Warehouse*, 859 N.W.2d at 531. *Sprinkler Warehouse* was a garnishment case, but it shows that recognizing these assets as property applies existing Minnesota law; it does not create new law. The question, then, is not whether Minnesota should extend conversion to intangible property generally. It is whether the assets at issue share the characteristics that make tangible property a fit subject for conversion. They do. Each is "an interest capable of precise definition," identified by a unique and permanent identifier. (*Kremen*, 337 F.3d at 1030; Am. Countercl. ¶¶ 27, 30, 32.) Each is "capable of exclusive possession or control," held by one account at a time to the exclusion of all others. (*Kremen*, 337 F.3d at 1030; *Sprinkler Warehouse*, 859 N.W.2d at 530 (a domain name is "unique and exclusionary, in that only one entity can register and use" it "at any given time"); Am. Countercl. ¶¶ 27, 30, 32.) Each is recorded by the platform that hosts it, which maintains the record of who holds it (and, for the Discord servers, of each transfer), the electronic equivalent of a document. (*Kremen*, 337 F.3d at 1033–34; Am. Countercl. ¶¶ 27, 30, 32.) Each is "valued, bought and sold." (*Kremen*, 337 F.3d at 1030; *Sprinkler Warehouse*, 859 N.W.2d at 531; Am. Countercl. ¶¶ 29–30, 32.) And each, like a chattel, can be taken from its owner but not copied. (Am. Countercl. ¶¶ 27, 30.) Peter's "legitimate claim to exclusivity" is pleaded as well (*Kremen*, 337 F.3d at 1030; Am. Countercl. ¶¶ 44, 161) and, for purposes of this motion, unchallenged (Mem. at 10 &

n.2). Assets with those characteristics fall within the traditional rule; applying it to them extends nothing.

*Kremen* explains why, even on the narrowest reading of the rule, the tangibility limit should not bar conversion here. Conversion "applied only to tangible property" when it was a remedy for lost goods, but "[v]irtually every jurisdiction . . . has discarded this rigid limitation to some degree." 337 F.3d at 1030. As *Kremen* put it, "[i]t would be a curious jurisprudence that turned on the existence of a paper document rather than an electronic one. Torching a company's file room would then be conversion while hacking into its mainframe and deleting its data would not." 337 F.3d at 1034; *see also Thyroff v. Nationwide Mut. Ins. Co.*, 8 N.Y.3d 283, 292–93 (2007) (answering certified question in favor of conversion of electronic records because "the protections of the law should apply equally to both forms—physical and virtual," and "the tort of conversion must keep pace with the contemporary realities of widespread computer use").

That reasoning applies with full force to the Roblox Group and its accounts (Count X). Each is controlled through a single account, the platform records who holds it, and owner status passes by transfer. (Am. Countercl. ¶¶ 27, 29, 32.) Adams and Balboa have retained those accounts, operated *Forsaken* through them, and collected the revenue credited to them. (*Id.* ¶¶ 99, 170.)

### D. The Spectre Robux Balance Is Not Money, and It Is Specific and Segregated.

Count XI also survives *TCI*'s discussion of money, for three reasons. First, the Spectre Robux Balance is not money. Robux is a virtual token issued by Roblox; it is not

legal tender, cannot leave the Roblox platform, and can be converted to dollars only through DevEx, with Roblox's approval. (Am. Countercl. ¶¶ 29, 176.) *TCI* addressed only "money in an intangible form." 890 N.W.2d at 428. Second, even if the money rule applied, the counterclaims satisfy it. *TCI* quoted *Halla v. Norwest Bank Minnesota, N.A.*, for the rule that money is "a subject of conversion only when it is capable of being identified, and described as a specific chattel." *Id.* at 429 (quoting *Halla*, 601 N.W.2d 449, 453 (Minn. Ct. App. 1999)). *Halla* itself drew the line at commingling: "[u]nless the deposited cash is segregated, there is no action for conversion." 601 N.W.2d at 453. The Spectre Robux Balance has been held in a single identified account, never commingled with any other, with every credit and debit recorded by Roblox. (Am. Countercl. ¶¶ 101, 176.) *TCI*'s gloss that money must be in "tangible form" came in a passage the court then declined to rest on. 890 N.W.2d at 429. Third, the Spectre Account itself is property under the analysis above; Adams and Balboa changed its credentials to exclude Peter. (Am. Countercl. ¶ 101.)

## V. COUNT XVII SHOULD NOT BE DISMISSED, AND THE ACCOUNTING REMEDY REMAINS IN ANY EVENT.

Adams and Balboa argue that an accounting is a remedy rather than a cause of action and that it requires a fiduciary relationship. (Mem. at 11.) Dismissing Count XVII would change nothing. Peter separately prays for "[a] full and complete accounting of all revenues, proceeds, and other benefits derived from the Forsaken Property" (Am. Countercl., Prayer ¶ E), relief that does not depend on Count XVII. At most, Count XVII pleads the factual basis for that relief, and any dismissal should be without prejudice to it.

Nor is a fiduciary relationship required. Adams and Balboa themselves frame the question as whether they were Peter's "fiduciaries or owed him an equitable duty to account." (Mem. at 11.) Their principal authority, in the words their ellipsis omits, makes an accounting available "primarily in two circumstances," one of which is "when the accounts at issue are exceedingly complicated." *United Prairie Bank-Mountain Lake v. Haugen Nutrition & Equip., LLC*, 813 N.W.2d 49, 57 n.3 (Minn. 2012) (finding neither circumstance present on a contractual attorney-fee claim); *see* Mem. at 11. And "[f]raud is an ancient source of equity jurisprudence, and an accounting generally will be given where it is charged." *Keough v. St. Paul Milk Co.*, 205 Minn. 96, 103, 285 N.W. 809, 815 (1939). Peter charges fraud (*see* Part I, *supra*), and he pleads complicated accounts: Adams and Balboa have exercised exclusive control over all *Forsaken* revenue, including Robux, DevEx conversions, and distributions to outside contributors, through flows that are complex and records Peter cannot access, so that the amounts owed "cannot be determined without an accounting." (Am. Countercl. ¶ 211.) For the same reason, Peter lacks an adequate remedy at law: a damages award cannot be measured until accounts that only Adams and Balboa control are reconstructed. Nor were they mere "counterparties to a negotiated sale" (Mem. at 12): Peter entrusted them with the servers on May 26, 2025, more than a month before any instrument existed. (Am. Countercl. ¶¶ 58–61, 133.)

## VI. IF THE COURT FINDS ANY PLEADING DEFICIENCY, DISMISSAL SHOULD BE WITHOUT PREJUDICE.

Leave to amend is "freely give[n] when justice so requires." Fed. R. Civ. P. 15(a)(2). It should be denied only for a reason "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182 (1962). None applies. Peter amended his counterclaims once, after conferral and before any motion was briefed or any ruling issued, so there has been no "repeated failure to cure deficiencies." (*See* Dkt. 21; Dkt. 34; Mem. at 12.) Adams and Balboa rely on *Moses.com Securities, Inc. v. Comprehensive Software Systems, Inc.*, 406 F.3d 1052, 1066 (8th Cir. 2005), for the proposition that leave may be denied where a party "already had the opportunity to amend the complaint and cure its defects." (Mem. at 12.) But in *Moses.com*, that opportunity came "when the district court ruled that the allegations in the first amended complaint were too indefinite," and the plaintiff then "failed to resolve the deficiencies in the second amended complaint." 406 F.3d at 1066. No court has identified any defect in Peter's counterclaims. And *Moses.com* itself asks whether "there are compelling reasons" to deny leave, such as "repeated failure to cure deficiencies by amendments previously allowed." *Id.* (cleaned up). The deadline for motions to amend, January 15, 2027, has not passed. (Dkt. 30.)

Nor would amendment be futile. Adams and Balboa's fact-based objections could each be addressed by additional allegations: more detail about Balboa's role and the

reliance on May 26; the context and reception of Adams' announcement; the platform records and exclusive control that make the servers, accounts, and Spectre Robux Balance specific and identifiable; and the exclusive control over *Forsaken*'s revenue that supports an accounting. Courts in this District routinely dismiss without prejudice in these circumstances. Dismissal with prejudice "is typically appropriate when a plaintiff has shown persistent pleading failures despite one or more opportunities to amend," or "when the record makes clear that any amendment would be futile"; otherwise, when claims "might conceivably be repleaded with success," dismissal without prejudice "is ordinarily justified." *United States ex rel. Louderback v. Sunovion Pharms., Inc.*, 703 F. Supp. 3d 961, 980 (D. Minn. 2023) (cleaned up); *see, e.g.*, *Moua v. Jani-King of Minn., Inc.*, 613 F. Supp. 2d 1103, 1112 (D. Minn. 2009) (dismissing fraud claims for lack of particularity without prejudice); *Thomas W. Lyons, Inc. v. Sonus-USA, Inc.*, No. 07-4227 (DWF/SRN), 2008 WL 185837, at *4 (D. Minn. Jan. 16, 2008) (same, where the deadline to amend pleadings had not passed); *In re Target Corp. Customer Data Sec. Breach Litig.*, 64 F. Supp. 3d 1304, 1314 (D. Minn. 2014) (dismissing negligent-misrepresentation claim for failure to plead reliance without prejudice). If the Court grants any part of the motion, Peter respectfully requests that the dismissal be without prejudice and with leave to file an amended pleading within thirty days.

## CONCLUSION

For these reasons, the Court should deny Adams and Balboa's Motion for Partial Dismissal. If the Court concludes that any challenged counterclaim is deficient, the

dismissal should be without prejudice and with leave to file an amended pleading within thirty days.

Dated: October 13, 2026

FOUNDATION LAW GROUP LLP

/s/ Jonathan B. Loiterman
Jonathan B. Loiterman (pro hac vice)
Stephen A. Cazares (pro hac vice)
4100 Alameda Avenue, 3rd Floor
Burbank, California 91505
(541) 930-2688
jon.loiterman@foundationlaw.com
scazares@foundationlaw.com

and

SAUL EWING LLP
Erin Westbrook (MN #0393072)
90 South Seventh Street, Suite 3900
Minneapolis, MN 55402
612-225-2946
erin.westbrook@saul.com

Attorneys for Defendant and
Counterclaim Plaintiff Peter Innes